EXHIBIT

3



# AMENDMENT TO LOAN DOCUMENTS

This Amendment to Loan Documents (this "*Amendment*"), dated as of January 26, 2023, is made by and among LAKEWOOD POINTE APTS LLC, a Delaware limited liability company ("*Borrower*"), FREDRICK SCHULMAN, an individual and MOSHE SILBER, an individual (collectively, "*Guarantors*"), and KEYBANK NATIONAL ASSOCIATION, a national banking association, and its successors, participants, and assigns ("*Lender*").

## RECITALS

**A.**    Borrower obtained a loan from Lender (the "*Loan*") pursuant to the terms of an Interim Loan Agreement dated July 28, 2021 by and between Borrower and Lender, as amended by Insurance Proceeds Letter dated June 17, 2022 by and between Borrower, RHODIUM CAPITAL ADVISORS, RH NEW ORLEANS HOLDINGS LLC, and Lender, and by Insurance Proceeds Letter dated December 22, 2022 by and between Borrower, RHODIUM CAPITAL ADVISORS, RH NEW ORLEANS HOLDINGS LLC, and Lender (together with any further amendments or modifications thereto, the "*Loan Agreement*"). The Loan is also evidenced by a Promissory Note dated July 28, 2021, in the maximum principal amount of $22,400,000.00 (together with any amendments or modifications thereto, the "*Note*"). As of January 26, 2023, the outstanding principal balance of the Loan, together with all amounts remaining for disbursement under the Loan, if any, was $22,400,000.00.

**B.**    Borrower's obligations under the Loan Agreement and the Note are secured by a Mortgage, Security Agreement, Assignment of Leases and Rents, Assignment of Contracts, and Fixture Filing recorded in the Parish of Orleans Records, Louisiana, under Instrument No. 2021-38637 (together with any amendments or modifications thereto, the "*Security Instrument*") against the real property legally described therein (the "*Property*").

**C.**    The Loan Agreement, Note, Security Instrument, and all other documents evidencing, securing, or otherwise governing the Loan, as they may have been amended or modified, are referred to herein collectively as the "*Loan Documents*."

**D.**    Borrower's obligations under the Loan Documents are guaranteed by Guarantors pursuant to a Limited Recourse Guaranty dated July 28, 2021 (together with any amendments or modifications thereto, the "*Guaranty*").

**E.**    Borrower has requested that Lender modify the terms of the Loan as set forth below. To accommodate Borrower's request, Borrower, Guarantors and Lender desire to modify the Loan on the terms and conditions set forth in this Amendment.

## AGREEMENTS

In consideration of the mutual promises, covenants, and conditions set forth herein, the parties hereto hereby agree as follows:

**1.**    **TERMINOLOGY.** The terms used in this Amendment shall have the same meanings as in the Loan Agreement, unless a different meaning is assigned herein or is required by the context hereof.

**Keycorp Confidential**
Last Revision Date: 12/14/2020

**KeyBank**

**2.        AMENDMENTS TO LOAN DOCUMENTS.** Upon satisfaction of all of the Conditions of Effectiveness (defined below), the following amendments shall take effect:

2.1        **Definitions.**

**2.1.1**        The following definitions in the Loan Agreement are amended to read as follows:

"**Exit Fee**": $336,000.00, which shall be paid pursuant to Section 7.4.

"*Initial Maturity Date*": December 31, 2023.

"*Maturity Date*": The Initial Maturity Date, or such earlier date on which the principal balance of the Loan may become due and payable upon acceleration by Lender in accordance with the Loan Documents and applicable law following an Event of Default.

2.1.2        The following definitions are added to the Loan Agreement:

"*Completion Guaranty*": A Performance and Completion Guaranty dated January 26, 2023 executed by each Guarantor, in form and substance acceptable to Lender, pursuant to which Guarantors jointly and severally guarantee, among other things, the lien-free and timely completion of the Renovations (as defined therein) in accordance with all provisions of this Agreement.

"*Guaranty*": Individually and collectively the Limited Recourse Guaranty and the Completion Guaranty.

**2.2        Interest.** Effective January 26, 2023, Article 5 of the Loan Agreement shall be deleted in its entirety and replaced with Article 5 attached as Exhibit A to this Amendment.

**2.3        Completion Guaranty.** Section 4.2.8 is amended to read as follows:

"4.2.8 Completion Guaranty"

**2.4        Extension of Loan Term.** The Maturity Date of the Loan shall be extended to December 31, 2023, unless Lender accelerates the Loan in accordance with the Loan Documents and applicable law pursuant to an Event of Default, in which case the Loan shall mature on the date of acceleration (the applicable date being referred to as the "*Maturity Date*"), all as more fully set forth in the Loan Agreement.

**2.5        Extension Option.**

**2.5.1**        The Extension Option is eliminated on the effective date hereof. Section 4.3.1 is amended in its entirety to read as follows:

"All outstanding principal, accrued unpaid interest, and other sums due under the Loan Documents are due and payable in full on the Maturity Date. All references herein to the Maturity Date shall mean the Initial Maturity Date."

**2.5.2**        Section 4.3.2 and Exhibit I to the Loan Agreement are deleted in their entirety.

---



**2.6    Financial Covenants and Reporting and Performance Related Covenants.**

**2.6.1**    The existing financial covenants and reporting requirements and performance related covenants set forth on Exhibit G of the Loan Agreement shall be amended and replaced in their entirety with the attached Replacement Exhibit B to the Loan Agreement ("REPLACEMENT EXHIBIT B"). References in the Loan Agreement to EXHIBIT G shall be deemed to reference REPLACEMENT EXHIBIT B

**2.6.2**  The existing form of Borrower's Compliance certificate attached as Exhibit H to the Loan Agreement shall be amended and replaced in its entirety with the attached Replacement Exhibit C to the Loan Agreement ("Replacement Exhibit C"). References in the Loan Agreement to Exhibit H shall be deemed to reference Replacement Exhibit C.

**2.7    Prepayments from Guarantor.** Section 4.4.2 is amended in its entirety to read as follows:

"Prepayments from Guarantor. Payments received from any Guarantor shall be applied to amounts owing under the Note and the other Loan Documents in such order as Lender may elect in its discretion. Any amounts received by Lender prior to an Event of Default from a Guarantor shall not reduce such Guarantor's personal liability under its Limited Recourse Guaranty or the Completion Guaranty absent Lender's prior written consent. Lender may reject and return any payment tendered by such Guarantor prior to an Event of Default without Lender's prior written consent."

**2.8    Cost of Maintaining the Loan.** Article 6 of the Loan Agreement is deleted in its entirety.

**2.9    Interest Reserve.** Section 11.2.1 of the Loan Agreement shall be amended and restated in its entirety to read as follows:

11.2.1 For Borrower's benefit, Lender has approved an interest reserve in the amount of $299,300 to be used in Lender's sole discretion for interest payments on the Loan in accordance with Section 11.2 and, with Lender's approval, amounts due from Borrower under any Interest Rate Agreement, if any, with respect to the Loan. Borrower hereby authorizes Lender in Lender's sole discretion from time to time, for the mutual convenience of Lender and Borrower, to disburse Loan proceeds to pay all accrued interest on the Note and amounts due from Borrower under any Interest Rate Agreement, if any, with respect to the Loan, regardless of whether Borrower specifically requests a disbursement of such amount. Any such disbursement, if made, shall be added to the outstanding principal balance of the Note and shall, when disbursed, bear interest at the Applicable Rate. The authorization hereby granted, however, shall not obligate Lender to disburse Loan proceeds for interest payments or any amount due under any Interest Rate Agreement, nor prevent Borrower from paying accrued interest or amounts due under any Interest Rate Agreement, if any, from its own funds, Borrower being obligated to pay such sums from its own funds. The Interest Reserve will be released when the Project achieves an as-is Debt Yield Ratio of 10% or greater and an as-is Debt Service Coverage Ration of 1.25:1.00 or greater based on a 7.0% underwriting rate and a 30-year amortization using trailing three (3) months operating statements. If the Interest Reverse falls to $50,000.00 or less Borrower shall immediately deposit additional funds in the Interest Reserve such that the Interest Reserve contains at least $100,000.00.



**2.10    Reserve Accounts.**

**2.10.1**    Section 13.1 of the Loan Agreement shall be amended and restated in its entirety to read as follows:

" 13.1 Establishment of Reserve Accounts.  On the Closing Date or as otherwise provided below, Borrower shall establish with Lender the following accounts for purpose of holding funds to be deposited by Borrower with Lender pursuant to this Article: an Interest Reserve as provided in Section 11.2 (the "Reserve Account").  The Reserve Account established through deposits with Lender shall be a custodial account established by Borrower with Lender and shall not constitute a trust fund.  At Lender's option, funds deposited into the Reserve Account may be commingled with other money held by Lender on behalf of Borrower.  Borrower acknowledges and agrees that the Reserve Account is subject to the sole dominion, control and discretion of Lender and its authorized agents or designees, subject to the terms hereof.  Borrower shall not have the right to make any withdrawal from the Reserve Account.  The Reserve Account shall secure the Obligations and, notwithstanding anything to the contrary contained herein, if an Event of Default has occurred and is continuing under any of the Loan Documents: (i) any amounts deposited into or remaining in the Reserve Account shall be for the account of Lender and may be withdrawn by Lender for application to amounts outstanding under the Loan Documents in any manner that Lender may elect, in Lender's sole discretion, and (ii) Borrower shall have no further rights in respect to the Reserve Account."

**2.10.2**    Section 13.1.1 is deleted in its entirety.

**2.10.3**    Section 13.2 entitled, "Disbursements" is deleted in its entirety.

**2.11    Casualty and Condemnation.** Section 14.1.5 is amended to add at the end thereof the following:

"All Net Claims Proceeds in excess of $1,283,300.00 (the "Excess Insurance Proceeds") held by Lender pursuant to Article 14 for restoration of the Improvements will be retained and held by Lender as additional collateral for the Loan until the Loan is repaid in full, including, but not limited to, any accrued fees, charges and interest and will not be disbursed pursuant to this Agreement to defray the costs of any repairs, renovations, or restoration including, but not limited to those set forth in the Budget attached hereto.  All such Excess Insurance Proceeds will be released by Lender to Borrower upon the indefeasible repayment in full of the Loan including but not limited to, any accrued fees, charges and interest."

**2.12**    Section 17.1.19 is amended in its entirety to read as follows:

"Any Guarantor takes any action to repudiate the Limited Recourse Guaranty or the Completion Guaranty or the Limited Recourse Guaranty or the Completion Guaranty otherwise ceases to be in full force and effect."

**3.    AMENDMENT TO LOAN DOCUMENTS:**  All references to the Maturity Date or the Initial Maturity Date in the Loan Documents including, but not limited to, the Security Instrument, shall be deemed to refer to December 31, 2023



4.    **CONDITIONS OF EFFECTIVENESS.**

**4.1    Conditions of Effectiveness.**  Notwithstanding its execution by all parties, the foregoing amendments shall become effective only upon satisfaction of all of the following "*Conditions of Effectiveness*":

**4.1.1    Beneficial Ownership Certification.**  Borrower shall have delivered to Lender a certification regarding beneficial ownership required by 31 C.F.R. § 1010.230, in such form as Lender may require (the "*Beneficial Ownership Certification*"). Lender's execution of this Amendment shall constitute Lender's agreement that this condition is satisfied.

**4.1.2    Execution and Recording of Documents.**  Borrower and Guarantors, as applicable have executed any and all documents necessary to effectuate this Amendment or otherwise required by Lender, including any required amendment to the Security Instrument, restated or substituted note, or UCC financing statements, and such documents have been filed or recorded, where necessary. Lender's execution of this Amendment shall constitute Lender's agreement that this condition is satisfied.

**4.1.3    Title Updates.**  Lender has obtained, at Borrower's expense, such new title policy or modification, date down, or other endorsements to Lender's existing Title Policy as Lender may require to insure the continued validity of the Security Instrument and its first lien priority on the Property over all encumbrances not previously agreed to by Lender in writing. Borrower and Guarantors understand that the amendments set forth herein shall not be effective or binding upon Lender in any respect until the required policy or endorsements have been issued in a form satisfactory to Lender. Lender's execution of this Amendment shall constitute Lender's agreement that this condition is satisfied.

**4.1.4    No Defaults.**  Borrower is in full compliance with all of its covenants and agreements under the Loan Documents, and there is no Default or Event of Default under the Loan Documents.

**4.2    Deadline.**  The Conditions of Effectiveness are intended solely for Lender's benefit and may, at Lender's election and in its sole discretion be enforced, fully or partially waived, or transformed into covenants of Borrower to be performed following effectiveness of the foregoing amendments upon Lender's subsequent written notice and demand. Unless waived in writing by Lender or otherwise agreed to by Lender in section 4.1 of this Amendment above, each of the Conditions of Effectiveness must be satisfied on or before January 26, 2023 or the amendments provided herein shall be of no further force or effect.

5.    **LIEN PRIORITY.**  The Property shall remain and continue in all respects subject to the Security Instrument, as amended, and nothing in this Amendment or done pursuant to this Amendment or the Amendment to Security Instrument shall affect or be construed to affect Lender's first-lien priority with respect to the Property.

6.    **REPRESENTATIONS AND WARRANTIES.**  Borrower and Guarantors hereby acknowledge, represent, warrant, and agree as of the date of this Amendment as follows:

**6.1**    The Recitals set forth above are true and accurate.

**6.2**    Borrower is the fee simple owner of the Property, and Lender has not assumed, and does not hereby assume, control of the Property.



**6.3**     To Borrower's knowledge, there is no Default or Event of Default under the Loan Documents.

**6.4**     To Borrower's knowledge, all necessary steps have been taken to perfect Lender's interest in the Property as security for the Loan, and the Security Instrument is, and shall continue to be, a first and paramount lien against the Property securing Borrower's obligations under the Loan Documents, as amended hereby and by any related documents executed in connection herewith.  To Borrower's knowledge, there are no liens, charges, or encumbrances against the Property that are now or may hereafter become prior to the Security Instrument.

**6.5**     All information provided in Borrower's Beneficial Ownership Certification is true, complete, and correct as of the date thereof.

**6.6**     All documents and other information requested by Lender from Borrower and Guarantors as a condition to entering into this Amendment are true, complete, and accurate in all respects.

**6.7**     The Guaranty is and shall remain fully binding and enforceable in accordance with its terms as to Borrower's obligations under the Loan, as amended hereby. Guarantors' obligations under the Guaranty are and shall continue to be entirely separate and independent from the obligations of Borrower under the Loan Documents.  In addition, any separate indemnity agreement executed by Guarantors in connection with the Loan shall remain in full force and effect and shall continue to be separate and independent from any Guaranty and the Loan Documents.

**6.8**     Borrower and Guarantors acknowledge that Lender is relying on the warranties, representations, releases, and agreements of Borrower and Guarantors in this Amendment, and would not enter into this Amendment or agree to modify the Loan Documents without such warranties, representations, releases, and agreements.

**7.**     **RELEASE.**  As of the date of this Amendment, Borrower and Guarantors agree that Lender has not breached any of its obligations under the Loan Documents, and Borrower and Guarantors have no claims against Lender, its predecessors, successors, assigns, or participants, or any of their officers, directors, agents, employees, and other affiliates (collectively, the ***"Released Parties"***) for fraud, misrepresentation, lender misconduct, lender liability, breach of alleged fiduciary duty, or other tort or wrongdoing.  Borrower and Guarantors hereby release and forever discharge the Released Parties of and from any and all claims, causes of action, rights of offset, and rights to damages that Borrower or any Guarantor has or may have, or may be entitled to assert, against the Released Parties for any reason whatsoever by reason of any actions, events, or occurrences prior to the date of this Amendment, except for Borrower's rights to enforce Lender's further obligations under the Loan Documents, as amended hereby.  The provisions, waivers, and releases set forth in this section are binding upon Borrower and Guarantors and their respective agents, employees, representatives, officers, directors, partners, members, joint venturers, affiliates, assigns, heirs, successors-in-interest and shareholders.  Neither Borrower nor Guarantor have claims, defenses, counterclaims, or rights of offset against any of the Released Parties arising out of or in any way connected with the Loan.

**8.**     **PAYMENT OF LENDER'S EXPENSES.**  Borrower agrees to reimburse Lender for all out-of-pocket expenses incurred by Lender in connection with the drafting, negotiation, execution, delivery, and performance of this Amendment and all related documents, including, without limitation, reasonable attorneys' fees and costs incurred by Lender, premiums for any new title policy or endorsements to Lender's existing Title Policy, appraisal fees, recording charges, escrow fees, and any other costs.



**9.    EFFECT ON LOAN DOCUMENTS.**  This Amendment shall be sufficient to serve as an amendment to all of the Loan Documents, as appropriate.  This Amendment supersedes and shall control over any inconsistent provisions of the Loan Documents, or any previous extensions or other amendments of the Loan Documents.  Except as amended herein, the Loan Documents shall remain in full force and effect as written, and the provisions of the Loan Documents shall remain unaffected, unchanged, and unimpaired hereby.

**10.    AUTHORIZATION/BINDING EFFECT.**  Each person signing this Amendment on behalf of Borrower and Guarantors warrants and represents that this Amendment was duly authorized by all individuals or entities whose authorization was required for this Amendment to be effective.  This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors, and assigns.

**11.    APPLICABLE LAW.**  This Amendment shall be construed in all respects and enforced according to the laws of the State of New York, without regard to that state's choice of law rules.

**12.    COUNTERPARTS.**  The parties may execute this Amendment in any number of counterparts, each of which shall be deemed an original instrument but all of which together shall constitute one and the same instrument.

**13.    STATE LAW PROVISIONS.**  NONE.


**[Remainder of page intentionally left blank; signatures appear on the following page(s)]**



EXECUTED as of the date of this Amendment.

**KeyBank**

**BORROWER:**

LAKEWOOD POINTE APTS LLC,
a Delaware limited liability company

By:
Name:    Fredrick Schulman
Title:    Authorized Signatory

**Keycorp Confidential**
Last Revision Date: 12/14/2020



**LENDER:**

KEYBANK NATIONAL ASSOCIATION,
a national banking association

By:
Name:   Joseph M. Tinti
Title:    Senior Vice President

**Keycorp Confidential**
Last Revision Date: 12/14/2020

**KeyBank** 🔑

**GUARANTORS:**

By: _____

Name: ____FREDRICK SCHULMAN____

**Keycorp Confidential**
Last Revision Date: 12/14/2020



**GUARANTORS:**

By:  _____

Name:    MOSHE SILBER

## REPLACEMENT EXHIBIT A TO LOAN AGREEMENT

## REPLACEMENT ARTICLE 5 OF LOAN AGREEMENT

**Replacement Definitions.**

The following definitions in the Loan Agreement are hereby replaced in their entirety as follows:

***Business Day:*** *(*i) any day other than Saturday, Sunday or any other day on which commercial banks in Cleveland, Ohio are authorized or required by law to close and (ii) with respect to any matters relating to SOFR, a SOFR Business Day.

***Margin***: 2.60 percent (260 basis points) per annum.

**New Definitions**.

The following definitions are hereby added to the Loan Agreement:

***Adjusted Daily Simple SOFR***: The sum of (a) Daily Simple SOFR *and* (b) the applicable SOFR Index Adjustment; *provided that* if Adjusted Daily Simple SOFR as so determined would be less than the Benchmark Floor, then Adjusted Daily Simple SOFR shall be deemed to be the Benchmark Floor.

> ***Base Rate***: For any day, a fluctuating rate per annum equal to the *highest of*:
>
> (a)  the rate of interest in effect for such day as established by KeyBank National Association, from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit, plus **0%**; or
>
> (b)  the Federal Funds Effective Rate in effect on such day plus .50%.
>
> Any change in the Base Rate due to a change in the prime rate or the Federal Funds Effective Rate, as applicable, shall be effective from and including the effective date of such change in the prime rate or the Federal Funds Effective Rate, respectively.

> ***Benchmark:*** Initially, Daily Simple SOFR; *provided that* if a Benchmark Transition Event has occurred with respect to the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement, to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 5.1.5.

> ***Benchmark Floor: 0.25*** percent (25 basis points) per annum.

> ***Benchmark Replacement:*** With respect to any Benchmark Transition Event for the then-current Benchmark, the sum of: (i) the alternate benchmark rate that has been selected by Lender as the replacement for such Benchmark giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for such Benchmark for credit facilities denominated in U.S. Dollars at such time and (ii) the related Benchmark



Replacement Adjustment, if any; provided that, if such Benchmark Replacement as so determined would be less than the Benchmark Floor, such Benchmark Replacement will be deemed to be the Benchmark Floor for the purposes of this Agreement and the other Loan Documents.

**Benchmark Replacement Adjustment**: With respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), if any, that has been selected by Lender giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. Dollar-denominated bilateral credit facilities.

**Benchmark Replacement Date**: The earlier to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any available tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current available tenors of such Benchmark (or the published component used in the calculation thereof).

**Benchmark Transition Event:** With respect to the then-current Benchmark, the occurrence of one or more of the following events with respect to such Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such

**Keycorp Confidential**
Last Revision Date: 12/14/2020



component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that such Benchmark (or such component thereof) is not, or as of a specified future date will not be, representative.

***Benchmark Transition Start Date***: With respect to any Benchmark, in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication).

***Benchmark Unavailability Period***:  With respect to any then-current Benchmark, the period (if any) (i) beginning at the time that a Benchmark Replacement Date with respect to such Benchmark pursuant to clauses (a) or (b) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 5.1.5 and (ii) ending at the time that a Benchmark Replacement has replaced such Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 5.1.5.

***Change in Law:***  The occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority; or (c) the making or issuance of any request, rule, guideline or directive (whether or not have the force of law) by any Governmental Authority; *provided, however*, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, or issued.

***Conforming Changes:***  With respect to either the use or administration of Daily Simple SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "SOFR Business Day," the addition of a concept of "interest period", timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, the applicability and length of lookback periods, the applicability of breakage compensation and other technical, administrative or operational matters) that Lender decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of any such rate exists, in such other manner of administration as Lender decides is



reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

***Daily Simple SOFR:*** For any day (a "***SOFR Rate Day***"), an interest rate per annum (rounded upward to the next highest 1/16th of 1% if such rate is not a multiple) equal to SOFR for the day (such day, the "***SOFR Determination Day***") that is five (5) SOFR Business Days prior to (i) if such SOFR Rate Day is a SOFR Business Day, such SOFR Rate Day, or (ii) if such SOFR Rate Day is not a SOFR Business Day, the SOFR Business Day immediately preceding such SOFR Rate Day, in each case, as and when SOFR for such SOFR Rate Day is published by the SOFR Administrator on the SOFR Administrator's Website. If by 5:00 pm (New York City time) on the second (2nd) SOFR Business Day immediately following any SOFR Determination Day, SOFR in respect of such SOFR Determination Day has not been published on the SOFR Administrator's Website and a Benchmark Replacement Date with respect to Daily Simple SOFR has not occurred, then SOFR for such SOFR Determination Day will be SOFR as published in respect of the first preceding SOFR Business Day for which such SOFR was published on the SOFR Administrator's Website; provided, that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Simple SOFR for no more than three (3) consecutive SOFR Rate Days. Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Borrower.

***FATCA:*** Sections 1471 through 1474 of the Internal Revenue Code as in effect from time to time, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such sections of the Internal Revenue Code as in effect from time to time.

***Relevant Governmental Body***: The Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

***SOFR***: A rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

***SOFR Administrator***: The Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

***SOFR Administrator's Website***: The website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

***SOFR Business Day***: Any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

***SOFR Determination Day***: Has the meaning specified in the definition of "Daily Simple SOFR".

***SOFR Index Adjustment***: 0.15%

***SOFR Rate Day:*** Has the meaning specified in the definition of "Daily Simple SOFR".



**Unadjusted Benchmark Replacement:** The applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

**U.S Government Securities Business Day:** Any day except for (i)　　a Saturday, (ii) a Sunday, or (iii) a day on which the Securities Industry and Financial Markets Administration recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

## Deleted Definitions.

The following definition(s) in the Loan Agreement is/are hereby removed in its/their entirety:

Adjusted Daily LIBOR Rate
Alternative Rate
Daily LIBOR Rate
Extended Maturity Date
Extension Option
Extension Term
Interest Period
LIBOR
LIBOR Business Day
LIBOR Rate Floor

## Replacement Article 5.

Article 5 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

ARTICLE 5

INTEREST RATE AND INTEREST RATE AGREEMENTS

5.1     Interest Rate.

5.1.1     Applicable Rate. Unless the Default Rate is applicable under the terms of the Loan Documents, and except as otherwise provided in Section 5.1.3, 5.1.4, or 5.1.5, the outstanding principal balance of the Loan will bear interest at Adjusted Daily Simple SOFR plus the Margin  (the "Applicable Rate").

5.1.2     Rates. The Applicable Rate may be determined by reference to a benchmark rate that is, or may in the future become, the subject of regulatory reform or cessation. Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Base Rate, Daily Simple SOFR, Adjusted Daily Simple SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Base Rate, Daily Simple SOFR, Adjusted Daily Simple SOFR, or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. Lender and its affiliates or other related entities may engage in transactions that affect the calculation of the Base Rate, Daily Simple SOFR, Adjusted Daily Simple SOFR, the any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. Lender may select information



sources or services in its reasonable discretion to ascertain the Base Rate, Daily Simple SOFR, Adjusted Daily Simple SOFR, or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to Borrower or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service. Lender will, in keeping with industry practice, continue using its current rounding practices in connection with the Base Rate, Daily Simple SOFR or Adjusted Daily Simple SOFR. In connection with the use or administration of Daily Simple SOFR or Adjusted Daily Simple SOFR, Lender will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. Lender will promptly notify Borrower of the effectiveness of any Conforming Changes in connection with the use or administration of Daily Simple SOFR or Adjusted Daily Simple SOFR.

5.1.3    Illegality.    If Lender determines that any applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for Lender or its applicable lending office to make, maintain, or fund loans whose interest is determined by reference to Daily Simple SOFR or SOFR, or to determine or charge interest rates based upon Daily Simple SOFR or SOFR, then, (i) Lender shall notify Borrower that Lender is no longer able to maintain the Applicable Rate based on Daily Simple SOFR, and (ii) the Applicable Rate shall automatically be converted to the Base Rate upon notice thereof to Borrower. The Base Rate will then be the Applicable Rate until Lender notifies Borrower that the circumstances described herein no longer exist, in which case the Applicable Rate will be converted back to Adjusted Daily Simple SOFR plus the Margin from the date of Lender's notice that such circumstances no longer exist.

5.1.4    Temporary Inability to Determine Rate.    If Lender determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Daily Simple SOFR" cannot be determined pursuant to the definition thereof other than as a result of a Benchmark Transition Event, Lender will promptly so notify Borrower. Upon notice thereof by Lender to Borrower, the Base Rate shall be the Applicable Rate until Lender revokes such notice.

5.1.5    Permanent Inability to Determine Rate; Benchmark Replacement.

5.1.5.1 Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document (and any Interest Rate Agreement shall be deemed not to be a "Loan Document" for purposes of this Section 5.1.5) , upon the occurrence of a Benchmark Transition Event, Lender may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement, in which case the "Applicable Rate" will be the Benchmark Replacement plus the Margin, and such amendment will become effective as of the effective date stated in the amendment. No replacement of the then-current Benchmark with a Benchmark Replacement pursuant to this Section 5.1.5 will occur prior to the applicable Benchmark Transition Start Date. Unless and until a Benchmark Replacement is effective in accordance with this Section 5.1.5.1, the Base Rate will be the Applicable Rate.

5.1.5.2 Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, Lender will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

**KeyBank** 🔑

5.1.5.3 Notices; Standards for Decisions and Determinations. Lender will promptly notify Borrower of the implementation of any Benchmark Replacement and the effectiveness of any Conforming Changes. Any determination, decision or election that may be made by Lender pursuant to this Section 5.1.5, including any determination with respect to a tenor, rate, or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in Lender's sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 5.1.5.

5.1.5.4 Benchmark Unavailability Period. During any Benchmark Unavailability Period, the Base Rate will be the Applicable Rate until a Benchmark Replacement has replaced the then-current Benchmark pursuant to this Section 5.1.5, in which case the Applicable Rate will be the Benchmark Replacement plus the Margin. Lender shall have no duty to notify Borrower in advance that the Applicable Rate is converting to the Base Rate, except as expressly required pursuant to this Section 5.1.5.

5.1.6    Information as to Rates. The applicable Base Rate, Adjusted Daily Simple SOFR, and Benchmark Replacement shall be determined by Lender, and such determination shall be conclusive absent manifest error.

5.1.7    Default Rate. The Loan shall bear interest at the Default Rate following the occurrence and during the continuation of any Event of Default.

5.1.8    Calculation of Interest. Interest at the Applicable Rate or Default Rate shall be calculated for the actual number of days elapsed on the basis of a 360-day year, including the first date of the applicable period to, but not including, the date of repayment.

5.1.9    Accrual of Interest. Interest shall accrue from the time of disbursement. For any Loan proceeds that are disbursed into escrow to be released to Borrower on the Closing Date, interest on such funds shall be calculated from the date Lender deposits such funds into escrow, regardless of whether and when Borrower satisfies all conditions for release of such funds from escrow. Lender shall have no obligation to require the escrow agent to deposit escrowed funds in an interest-bearing account.

5.2    Increased Costs.

5.2.1    Increased Costs Generally. If any Change in Law shall:

5.2.1.1 impose, modify or deem applicable any reserve (including pursuant to regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of the Federal Reserve Board) as in effect from time to time), special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, Lender;

5.2.1.2 subject Lender to any taxes (other than (a) taxes imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Documents, (b) any withholding taxes imposed under FATCA, and (c) taxes that are imposed on or measured by net income (however denominated) or that are franchise taxes of branch profits taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

**KeyBank 🔑**

5.2.1.3  impose on Lender any other condition, cost or expense (other than taxes) affecting this Agreement or the Loan;

and the result of any of the foregoing shall be to increase the cost to Lender of making, converting to, continuing or maintaining the Loan or of maintaining its obligation to make the Loan, or to increase the cost to Lender, or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or any other amount) then, upon request of Lender, Borrower will pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

5.2.2   Capital Requirements.  If Lender determines that any Change in Law affecting Lender or any lending office of Lender or Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on Lender's capital or on the capital of Lender's holding company, if any, as a consequence of this Agreement, the commitments of Lender, or the Loan made by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount or amounts as will compensate Lender or Lender's holding company for any such reduction suffered.

5.2.3   Certificates for Reimbursement.  A certificate of Lender setting forth the amount or amounts necessary to compensate Lender or its holding company, as the case may be, as specified in subsection 5.2.1 or 5.2.2 of this Section and delivered to Borrower, shall be conclusive absent manifest error. Borrower shall pay Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

5.2.4   Delay in Requests. Failure or delay on the part of Lender to demand compensation pursuant to this Section shall not constitute a waiver of Lender's right to demand such compensation; provided that Borrower shall not be required to compensate Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions, and of Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

5.3   Interest Rate Agreements.

5.3.1   Borrower shall afford Lender a right of first opportunity to provide all Interest Rate Protection Products, but shall not be required to purchase any Interest Rate Protection Product from Lender.

5.3.2   If Borrower elects to institute an interest rate hedging program through the purchase of an Interest Rate Protection Product from Lender or any other party providing such an Interest Rate Protection Product, Borrower shall enter into such party's customary form of Interest Rate Agreement relating to such Interest Rate Protection Product. Any indebtedness incurred pursuant to an Interest Rate Agreement entered into by Borrower and Lender shall constitute indebtedness evidenced by the Note and secured by the Security Instrument and the other Loan Documents to the same extent and effect as if the terms and provisions of such Interest Rate Agreement were set forth herein, whether or not the aggregate of such indebtedness, together with the disbursements of Loan proceeds, exceed the face amount of the Note.

5.3.3   Borrower hereby collaterally assigns to Lender any and all Interest Rate Protection Products purchased or to be purchased by Borrower in connection with the Loan, as additional security for



the Loan, and agrees to provide Lender with any additional documentation requested by Lender in order to confirm or perfect such security interest during the term of the Loan. If Borrower obtains an Interest Rate Protection Product from a party other than Lender, Borrower shall deliver to Lender such third party's consent to such collateral assignment. Borrower shall not pledge an interest in Borrower, the Project, or any other collateral for the Loan, to secure any Interest Rate Protection Product purchased from a third party.

**REPLACEMENT EXHIBIT B TO LOAN AGREEMENT**

FINANCIAL REPORTING/FINANCIAL AND PERFORMANCE RELATED COVENANTS

**Financial Reporting / Financial & Performance-Related Covenants**

**1.    Required Financial Reporting**

| Individual or Entity Required to Provide Information | Information to Be Provided | Frequency |
|---|---|---|
| Borrower | Annual financial statements (including a detailed Balance Sheet, Income Statement and Cash Flow Statement certified by Guarantor and Managing Member of Borrower) | Annually, within 120 days after 12/31 of each year, commencing with the year ending 12/31/2022 |
| Borrower | Signed federal tax returns together with all schedules | Annually, no later than 60 days following the earlier of the filing of such return or such return's last due date (including any extensions), after the Lender's request. |
| Borrower | Operating statement and rent roll | Quarterly, within 15 days after 3/31, 6/30, 9/30, and 12/31 of each year, commencing with the period ending December 31, 2022 |
| Guarantor | Annual financial statements, of Guarantor, certified and acceptable to Lender (including detailed Balance Sheets, Income Statements, Cash Flow Statements and Contingent Liabilities as footnoted in financial statements) certified to Lender by the Guarantor and confirming the Guarantor's liquid assets with a Compliance Certificate executed by the Guarantor and the Managing Member of Borrower. | Annually, within 120 days after 12/31 of each year, commencing with the year ending 12/31/2022 |
| Guarantor | Schedule of Real Estate Holdings | Annually, within 120 days after 12/31 of each year, commencing with the year ending 12/31/2022 |
| Guarantor | Bank Statements and/or Brokerage Statements verifying liquidity | Annually, within 120 days after 12/31 of each year, commencing with the year ending 12/31/20222 |

| Individual or Entity Required to Provide Information | Information to Be Provided | Frequency |
|---|---|---|
| Guarantor | Signed federal tax returns together with all schedules | Annually, no later than 60 days following the earlier of the filing of such return or such return's last due date, commencing upon Lender's request |
| Borrower | Certificate of Compliance in the form of EXHIBIT C to the Loan Aggregate | Annually, within 120 days after 12/31 of each year, commencing with the year ending 12/31/2022 |
| Guarantor | Certificate of Compliance in the form of EXHIBIT A to the Guaranty | Annually, within 120 days after 12/31 of each year, commencing with the year ending 12/31/2022 |

2.    **Financial & Performance-Related Covenants**

      **Borrower and Guarantor Covenants**

| Individual or Entity(ies) Required to Comply with Covenant | Financial Covenant | Frequency at Which Compliance Will Be Measured |
|---|---|---|
| Guarantor | Total Liquidity of Guarantors of not less than $8,500,000.00 in the aggregate | Annually, within 120 days after 12/31 of each year, commencing with the year ending 12/31/2022 |
| Guarantor | A minimum Net Worth of Guarantors of $120,000,000.00 in the aggregate | Annually, within 120 days after 12/31 of each year, commencing with the year ending 12/31/2022 |

**Keycorp Confidential**
Last Revision Date: 12/14/2020

**Performance-Related Covenants**

| Individual or Entity to Certify Compliance | Financial Covenant | Frequency at Which Compliance Will Be Measured |
|---|---|---|
| Borrower | The Project has a minimum Debt Yield Ratio of 5.9% based on the current Rent Roll and trailing twelve (12) month operating statements for the Project. The Borrower shall cure a default in this Performance-Related Covenant by paying down the outstanding principal balance of the Loan by $1,500,000.00, without any obligation to pay any prepayment premium, fee or other charge in connection therewith provided the Exit Fee shall be payable upon full repayment of the Loan as provided in the Loan Agreement. | Once, on April 30, 2023 |

| Individual or Entity to Certify Compliance | Financial Covenant | Frequency at Which Compliance Will Be Measured |
|---|---|---|
| Borrower | At least seventy five percent (75%) of the units in the Project are leased to and occupied by third party tenants paying market rate rents on leases with terms of at least one (1) year as evidenced by a current Rent Roll. Borrower shall cure a default in this Performance-Related Covenant by paying down the outstanding principal balance of the Loan by $1,500,000.00, without any obligation to pay any prepayment premium, fee or other charge in connection therewith provided the Exit Fee shall be payable upon full repayment of the Loan as provided in the Loan Agreement. | Once, on April 30, 2023 |
| | At least 50 units (of the 83 level 1-4 units and 21 gutted units) renovated and rent ready per the attached Budget. Borrower shall cure a default in this Performance-Related Covenant by paying down the outstanding principal balance of the Loan by $1,500,000.00, without any obligation to pay any prepayment premium, fee or other charge in connection therewith provided the Exit Fee shall be payable upon full repayment of the Loan as provided in the Loan Agreement. | On or before April 30, 2023 |
| | 25 no power units inspected and rent ready per the attached Budget. | On or before April 30, 2023 |

| Borrower | At least 35 additional units in excess of the 50 units referenced above (of the 83 level 1-4 units and 21 gutted units) are renovated and rent ready per the attached Budget. Borrower shall cure a default in this Performance-Related Covenant by paying down the outstanding principal balance of the Loan by $1,500,000.00, without any obligation to pay any prepayment premium, fee or other charge in connection therewith provided the Exit Fee shall be payable upon full repayment of the Loan as provided in the Loan Agreement. | On or before October 31, 2023 |
|---|---|---|
| | The Project has a minimum Debt Yield Ratio of 8.9% based on the current Rent Roll and trailing twelve (12) month operating statements for the Project. Borrower shall cure a default in this Performance-Related Covenant by paying down the outstanding principal balance of the Loan by $1,500,000.00, without any obligation to pay any prepayment premium, fee or other charge in connection therewith provided the Exit Fee shall be payable upon full repayment of the Loan as provided in the Loan Agreement. | On or before October 31, 2023 |
| | At least ninety percent (90%) of the units in the Project are leased to and occupied by third party tenants paying market rate rents on leases with terms of at least one (1) year as evidenced by a current Rent Roll. Borrower shall cure a default in this Performance-Related Covenant by paying down the outstanding principal balance of the Loan by $1,500,000.00, without any obligation to pay any prepayment premium, fee or other charge in connection therewith provided the Exit Fee shall be payable upon full repayment of the | On or before October 31, 2023 |

**Keycorp Confidential**
Last Revision Date: 12/14/2020

| Individual or Entity to Certify Compliance | Financial Covenant | Frequency at Which Compliance Will Be Measured |
|---|---|---|
| | Loan as provided in the Loan Agreement. | |

**SOFT AND HARD COST REQUISITION**

Borrower: Lakewood Pointe
Project:  Laguna Run

Date:
Requisition:

| Item No. | Item Description | Scheduled Value (Budget) | Previous Changes | Current Changes | Revised Value (Budget) | KeyBank Loan | Borrower's Equity & Other Source of Funds | Previous Applications | This Application | Total Completed & Drawn to Date | Percent Complete | Balance to Finish + Retainage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F [C + D+ E] | G | H | I [K Prev. Draw] | J | K [I + J] | L [K / F] | M [F - K] |
| USES | Soft Costs | | | | | | | | | | | |
| | Land | | | | 0.00 | 0.00 | | | | 0.00 | | 0.00 |
| | Interest Reserve | | | | 0.00 | 0.00 | | | | 0.00 | | 0.00 |
| | Soft Cost Contingency | | | | 0.00 | 0.00 | | | | 0.00 | | 0.00 |
| | SUBTOTAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| | | | | | | | | | | | | |
| | Interior Renovation | | | | | | | | | | | |
| | Level 1 (19 Units) | 70,300.00 | | | 70,300.00 | 0.00 | 70,300.00 | | | 0.00 | | 70,300.00 |
| | Level 2 (15 Units) | 63,000.00 | | | 63,000.00 | 0.00 | 63,000.00 | | | 0.00 | | 63,000.00 |
| | Level 3 (32 Units) | 176,000.00 | | | 176,000.00 | 0.00 | 176,000.00 | | | 0.00 | | 176,000.00 |
| | Level 4 (17 Units) | 119,000.00 | | | 119,000.00 | 0.00 | 119,000.00 | | | 0.00 | | 119,000.00 |
| | Gutted Units (21 Units) | 367,500.00 | | | 367,500.00 | 0.00 | 367,500.00 | | | 0.00 | | 367,500.00 |
| | Units Requiring Power Inspection (25 Units) | 187,500.00 | | | 187,500.00 | 0.00 | 187,500.00 | | | 0.00 | | 187,500.00 |
| | Hard Cost Contingency | 300,000.00 | | | 300,000.00 | 0.00 | 300,000.00 | | | 0.00 | | 300,000.00 |
| | SUBTOTAL | 1,283,300.00 | 0.00 | 0.00 | 1,283,300.00 | 0.00 | 1,283,300.00 | 0.00 | 0.00 | 0.00 | | 1,283,300.00 |
| | TOTAL USES | 1,283,300.00 | 0.00 | 0.00 | 1,283,300.00 | 0.00 | 1,283,300.00 | 0.00 | 0.00 | 0.00 | | 1,283,300.00 |
| | | | | | | | | | | | | |
| SOURCES | KeyBank Loan | | | | 0.00 | 0.00 | | | | 0.00 | | 0.00 |
| | Insurance Proceeds | 1,283,300.00 | | | 1,283,300.00 | | 1,283,300.00 | | | 0.00 | | 1,283,300.00 |
| | Other Source of Funds | | | | 0.00 | | 0.00 | | | 0.00 | | 0.00 |
| | Other Source of Funds | | | | 0.00 | | 0.00 | | | 0.00 | | 0.00 |
| | TOTAL SOURCES | 1,283,300.00 | 0.00 | 0.00 | 1,283,300.00 | 0.00 | 1,283,300.00 | 0.00 | 0.00 | 0.00 | | 1,283,300.00 |

**Keycorp Confidential**
Last Revision Date: 12/14/2020

## REPLACEMENT EXHIBIT C TO LOAN AGREEMENT

### Borrower's Certificate of Compliance

KeyBank National Association
66 South Pearl Street 7th floor
Mail Code NY-31-66-0767
Albany, NY 12207
Attn: Real Estate Capital Servicing

Re:    Interim Loan Agreement dated as of July 28, 2021 (as amended, modified, supplemented, restated, or renewed, from time to time, the "*Agreement*"), between **LAKEWOOD POINTE APTS LLC**, ("*Borrower*"), and **KEYBANK NATIONAL ASSOCIATION** ("*Lender*").

Reference is made to the Agreement. Capitalized terms used in this Certificate of Compliance (including schedules and other attachments hereto, this "*Certificate*") without definition have the meanings specified in the Agreement.

Pursuant to applicable provisions of the Agreement, the undersigned, being the Authorized Representative designated in the Agreement, hereby certifies to Lender that the information provided in this Certificate, including each of the calculations listed below, and all information in the attached schedules, is true, correct, and complete in all material respects as of the last day of the reporting period, and as of the last day of the fiscal periods for the financial statements submitted to Lender in connection herewith.

The undersigned hereby further certifies to Lender that:

1.    <u>Compliance with Financial Covenants</u>. As shown below, Borrower is in full compliance with the Financial Covenants contained in the Agreement.

      A.    **COVENANT: Debt Yield Ratio of at least 5.9% as of April 30, 2023 and at least 8.9% as of October 31, 2023.**

      **<u>Borrower's Calculation:</u>**

      Debt Yield Ratio = Net Operating Income /Commitment Amount

      • Net Operating Income = Gross Revenues for a trailing twelve (12) month period – Operating Expenses for a trailing twelve (12) month period adjusted if applicable as provided in the definition of Operating Expenses = _____

      **Debt Yield =** _____ : as of _____.

      Compliance? (Yes or No)    _____

2.    <u>Review of Condition</u>. The undersigned has reviewed the terms of the Agreement, including the representations, warranties, and covenants of Borrower and each Guarantor set forth in the Loan Documents, and has made, or caused to be made under his or her supervision, a review in reasonable detail of the transactions and condition of Borrower and each Guarantor through the applicable reporting periods.

---

**3.**     <u>Representations and Warranties</u>.  To the undersigned's actual knowledge, the representations and warranties of Borrower and each Guarantor contained in the Loan Documents, including those contained in the Agreement, the Limited Recourse Guaranty, are true and accurate in all material respects as of the date hereof, and were true and accurate in all material respects at all times during the reporting period, except as expressly noted on SCHEDULE A hereto.

**4.**     <u>Covenants</u>.  To the undersigned's actual knowledge, during the reporting period, Borrower observed and performed all of the respective covenants and other agreements under the Agreement and the Loan Documents, and satisfied each of the conditions contained therein to be observed, performed, or satisfied by Borrower, except as expressly noted on SCHEDULE A hereto.

**5.**     <u>No Event of Default</u>.  To the undersigned's actual knowledge, no Default or Event of Default exists as of the date hereof or existed at any time during the reporting period, except as expressly noted on SCHEDULE A hereto.

This Certificate is executed by the undersigned this _____ day of _____.

                              **LAKEWOOD POINTE APTS LLC,**
                              a Delaware limited liability company


                              **By:**     _____
                              Name:  Fredrick Schulman
                              Its:      Authorized Representative

**SCHEDULE A**
**TO**
**CERTIFICATE OF COMPLIANCE**

Exceptions to financial covenants

139776008.22





## PROMISSORY NOTE
### (Project Commonly Known as *"Laguna Run Apartments"*)

US $22,400,000.00                                                                July 28, 2021

NOTICE TO BORROWER:  THIS DOCUMENT CONTAINS PROVISIONS FOR A VARIABLE INTEREST RATE.

FOR VALUE RECEIVED, LAKEWOOD POINTE APTS LLC, a Delaware limited liability company ("*Borrower*"), having an address at 7001 Martin Drive, New Orleans, Louisiana 70126, hereby promises to pay to the order of KEYBANK NATIONAL ASSOCIATION, a national banking association ("*Lender*"), having an address at 66 South Pearl Street, 7th Floor, Mail Code: NY-31-66-0767, Albany, NY 12207, the principal sum of TWENTY TWO MILLION FOUR HUNDRED THOUSAND and 00/100ths DOLLARS ($22,400,000.00) or so much thereof as may be advanced from time to time, together with interest on the balance of principal from time to time outstanding, in United States currency, at the rates and at the times hereinafter described.

This Note is made by Borrower in favor of Lender pursuant to that certain Interim Loan Agreement of even date herewith (the "*Loan Agreement*") entered into between Lender and Borrower. This Note evidences the Loan (as defined in the Loan Agreement). Payment of this Note is governed by the Loan Agreement, the terms of which are incorporated herein by express reference as if fully set forth herein. Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

1.    **Interest.**  Provided that no Event of Default exists, the principal amount of the Loan outstanding from time to time will bear interest at the Applicable Rate(s). Interest shall accrue on the unpaid principal balance of this Note from the date of the first disbursement of Loan proceeds.

2.    **Monthly Payments.**  Interest only shall be payable in arrears on the tenth (10th) day of each calendar month commencing on August 10, 2021, up to and including the Maturity Date in the amount of all interest accrued and unpaid through the end of the preceding calendar month.  If a payment is due on a day that is not a Business Day, such payment shall be deemed due on the next succeeding Business Day. All payments on account of the indebtedness evidenced by this Note shall be made to Lender not later than 2:00 p.m. EST/EDT, on the day when due in lawful money of the United States, and shall be first applied to late charges, costs of collection or enforcement, and other similar amounts due, if any, under this Note and any of the other Loan Documents, then to interest due and payable hereunder and the remainder to principal due and payable hereunder.

3.    **Maturity Date.**  The indebtedness evidenced hereby shall mature on the Maturity Date. On the Maturity Date, the entire outstanding principal balance hereof, together with accrued and unpaid interest and all other sums evidenced by this Note, together with costs of collection and reasonable attorneys' fees, shall, if not sooner paid, become due and payable.

4.    **General Provisions.**

4.1    **Default Rate/Late Charge.**  If (a) Borrower fails to make any payment of principal or interest when due or (b) an Event of Default exists, then the principal balance hereof shall

---

{00372382 v1 }                                    *Promissory Note*
                                                       *page 1*

**Keycorp Confidential**

thereafter bear interest at the Default Rate. In addition, Borrower shall pay, on demand, the Late Charge stated in the Loan Agreement to cover the extra expense involved in handling delinquent payments.

**4.2    Business Purpose.** Borrower represents and warrants to Lender that the proceeds of this Note shall be used by Borrower exclusively for commercial and business purposes, and that none of the proceeds of this Note shall be used by Borrower for personal, family, or household purposes. Borrower agrees that the obligation evidenced by this Note is an exempt transaction under the Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.*

**4.3    Severability.** Each provision in this Note is intended to comply with all applicable Laws. However, if a court of competent jurisdiction holds that any provision of this Note, or any portion thereof, is illegal, invalid, unlawful, void, or otherwise unenforceable as written, (i) such provision, or portion thereof, shall be given force and effect to the fullest possible extent permitted under applicable Laws, (ii) this Note shall be construed as if the illegal, invalid, unlawful, void, or otherwise unenforceable provision or portion thereof was not contained herein, and (iii) the rights, obligations, and interests of Borrower and the holder(s) of this Note shall continue in full force and effect to the fullest extent permitted under applicable Laws.

**4.4    Maximum Interest.** Notwithstanding any other provision of this Note or any other Loan Document, all interest, loan fees, and charges payable by reason of the indebtedness evidenced by this Note shall not exceed the maximum, if any, permitted by applicable Laws. If by virtue of applicable Laws, sums in excess of such maximum would otherwise be payable, then such excess sums shall be construed as having been immediately applied by Lender to the principal balance of this Note when received. If at the time that any such sum is received by Lender the principal balance of this Note has been paid in full, Lender shall promptly refund such sums to Borrower, less any sums due to Lender.

**4.5    Binding Agreement.** This Note and all provisions hereof shall be binding upon Borrower and all persons claiming under or through Borrower, and shall inure to the benefit of Lender, together with its successors and assigns, including each holder from time to time of this Note.

**4.6    Miscellaneous.** Time is of the essence as to all dates set forth herein. Captions and headings in this Note are for convenience only and shall be disregarded in construing it.

**4.7    Extensions and Modifications.** Borrower agrees that its liability shall not be affected in any manner by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender; and Borrower consents to any indulgences and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this Note, and to any substitution, exchange or release of the collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any borrowers, endorsers, guarantors, or sureties, all whether primarily or secondarily liable, without notice to Borrower and without affecting its liability hereunder.

**4.8    Waivers.** Borrower hereby waives and renounces for itself, its successors and assigns, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, or exemption and homestead laws now provided, or that may hereafter be provided, by applicable Laws against the enforcement and collection of the obligations evidenced by this Note.

**4.9    Costs of Collection.** If this Note is placed in the hands of attorneys for collection or is collected through any legal proceedings, Borrower promises and agrees to pay, in addition to the principal, interest and other sums due and payable hereon, all Legal Expenses incurred by Lender.

**4.10    Additional Waivers.**  All parties now or hereafter liable with respect to this Note, whether borrower, principal, surety, guarantor, endorsee or otherwise, hereby severally waive presentment for payment, demand, notice of nonpayment or dishonor, protest and notice of protest.  No failure to accelerate the indebtedness evidenced hereby, acceptance of a past due installment following the expiration of any cure period provided by this Note, any Loan Document, or applicable Laws, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of the right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of the right of acceleration or any other right granted hereunder, under any of the other Loan Documents, or by applicable Laws.  Borrower hereby expressly waives the benefit of any Laws that would produce a result contrary to or in conflict with the foregoing.

**4.11    Joint and Several Liability.**  Except as otherwise specifically provided herein or in the Loan Agreement, each person or entity signing or otherwise liable for this Note agrees that each is jointly and severally liable hereunder and under all of the other Loan Documents as a principal, and not as a surety.

**4.12    Governing Law.**  THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.

**[Remainder of page intentionally left blank; signature(s) appear on the following page]**

Borrower has delivered this Note as of the day and year stated on the first page of this Note.

**BORROWER:**                          **LAKEWOOD POINTE APTS LLC,**
                                       a Delaware limited liability company

                                       By: _____
                                       Name:  Fredrick Schulman
                                       Its:   Authorized Signatory

2021-38637  Page 1 of 44

Record and return to:
Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701
MTA 154376-03

**EXHIBIT**

**5**

*This document prepared by;*
*After recording return to:*

James J. Schwert, Esq.
Fox Rothschild LLP
222 South Ninth Street, Suite 2000
Minneapolis, MN 55402-3338

KeyBank 🔑.

## MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, ASSIGNMENT OF CONTRACTS AND SECURITY AGREEMENT

### (Project Commonly Known as *"Laguna Run Apartments"*)

BE IT KNOWN on this 28th day of July, 2021, before me the undersigned Notary Public, and in the presence of the undersigned competent witnesses, personally came and appeared **LAKEWOOD POINTE APTS LLC,** a limited liability company organized and existing under the laws of Delaware ("**Mortgagor**"), appearing herein through its Authorized Signatory, duly authorized pursuant to certified resolutions attached hereto as Schedule 1 (last four (4) digits of Taxpayer Identification No. 9625), whose address is 7001 Martin Drive, New Orleans, Louisiana 70126, as mortgagor, who by me duly sworn did declare and acknowledge that Mortgagor is indebted in favor of KEYBANK NATIONAL ASSOCIATION, a national banking association, its successors, participants, and assigns, as mortgagee ("**Lender**"), whose address is 66 South Pearl Street, 7th Floor, Mail Code: NY-31-66-0567, Albany, NY 12207.

Capitalized terms used in this Security Instrument without definition have the meanings given to them in the Loan Agreement referred to below.

This Multifamily Mortgage, Assignment of Leases and Rents and Security Agreement (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Security Instrument**") is executed by Mortgagor to and for the benefit of Lender.

**Notice to Mortgagor: The Note secured by this Security Instrument contains provisions for a variable interest rate.**

1.    **GRANT AND SECURED OBLIGATIONS.**

1.1.1    **Grant.** Mortgagor, in consideration of (i) the loan in the original principal amount of $22,400,000.00 (the "**Mortgage Loan**") evidenced by that certain Promissory Note

dated as of the date of this Security Instrument, executed by Mortgagor and made payable to the order of Lender, maturing on January 28, 2023, (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Note**"), and (ii) that certain Interim Loan Agreement dated as of the date of this Security Instrument, executed by and between Mortgagor and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), and to secure to Lender the repayment of the Secured Obligations (as defined below), and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Mortgagor contained in the Loan Documents (as defined in the Loan Agreement), hereby grants a mortgage lien on, affects, pledges, hypothecates, and collaterally assigns to and for the benefit of Lender the following Property (the "Property"), including the immovable property having a municipal address of 7001 Martin Drive, New Orleans, Louisiana 70126 and located in the Parish of Orleans, Louisiana, and described in <u>Exhibit A</u> attached to this Security Instrument and incorporated by reference (the "**Land**"):

       **1.1.2**    The real property located in the Parish of Orleans, state of Louisiana, as described in EXHIBIT A attached hereto, together with all existing and future easements and rights affording access to it (the *"Premises"*);

       **1.1.3**    All buildings, structures, and improvements now located or later to be constructed on the Premises (the *"Improvements"* and, together with the Premises, the *"Project"*);

       **1.1.4**    All existing and future appurtenances, privileges, easements, franchises, and tenements of the Premises, including all minerals, oil, gas, other hydrocarbons and associated substances, sulfur, nitrogen, carbon dioxide, helium, and other commercially valuable substances that may be in, under or produced from any part of the Premises, all development rights and credits, air rights, water, water rights (whether riparian, appropriative or otherwise, and whether or not appurtenant), and water stock, and any portion of the Premises lying in the streets, roads or avenues currently existing or later constructed;

       **1.1.5**    All existing and future leases, subleases, subtenancies, licenses, rental agreements, occupancy agreements, and concessions relating to the use and enjoyment of or affecting all or any part of the Premises or Improvements, any and all guaranties, extensions, renewals, replacements and modifications thereof, and all other agreements relating to or made in connection therewith, and any agreement (written or oral) between Mortgagor or its agents, and any tenant, lessee, occupant, licensee, guest or invitee pursuant to which Mortgagor, or its agent, agrees to permit such tenant, lessee, occupant, licensee, guest or invitee to park in or at the Project (each a *"Lease"*, and collectively, the *"Leases"*);

       **1.1.6**    All real property and improvements on such real property, and all appurtenances and other property and interests of any kind or character, whether described in EXHIBIT A or not that may be reasonably necessary or desirable to promote the present and any reasonable future beneficial use and enjoyment of the Premises or Improvements;

       **1.1.7**    All goods, materials, supplies, chattels, furniture, fixtures, equipment, and machinery now or later to be attached to, placed in or on, or used in connection with the use, enjoyment, occupancy or operation of all or any part of the Premises or Improvements, whether stored on the Premises or elsewhere, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration,

and plumbing fixtures and equipment, all of which shall be considered to the fullest extent of the law to be real property for purposes of this Security Instrument, and any manufacturer's warranties with respect thereto;

      1.1.8   All building materials, equipment, work in process and other personal property of any kind, whether stored on the Premises or elsewhere, that have been or later will be acquired for the purpose of being delivered to, incorporated into or installed in or about the Premises or Improvements;

      1.1.9   All of Mortgagor's interest in and to all operating accounts, the Loan funds, whether disbursed or not, all reserve accounts, impound accounts, and any other bank accounts of Mortgagor relating to the Project or the operation thereof;

      1.1.10   All rights to the payment of money, accounts, accounts receivable, reserves, deferred payments, refunds, cost savings, payments and deposits, whether now or later to be received from third parties (including all earnest money sales deposits) or deposited by Grantor with third parties (including all utility deposits), chattel paper, instruments, documents, notes, drafts and letters of credit (other than letters of credit in favor of Beneficiary), that arise from or relate to construction on the Premises, leasing of the Premises or Improvements, or to any business now or later to be conducted on it, or to the Premises and Improvements generally;

      1.1.11   All refunds, rebates, reimbursements, reserves, deferred payments, deposits, cost savings, governmental subsidy payments, governmentally-registered credits, other credits (including development credits), waivers and payments, whether in cash or in kind, allocated to the Premises, the Improvements, or Mortgagor, or due and payable by (i) any federal, state, municipal or other governmental or quasi-governmental agency, authority or district or (ii) any insurance or utility company relating to any or all of the Premises or Improvements or arising out of the satisfaction of any conditions imposed upon or the obtaining of any approvals for the development or rehabilitation of the Land or Improvements

      1.1.12   All insurance policies and the proceeds thereof pertaining to the Premises, the Improvements, or any other property described in this Section 1.1.1, and all proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any property described in this Section 1.1.1 into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding or any settlement in lieu thereof, and all causes of action and their proceeds for any damage or injury to the Premises, Improvements or the other property described in this Section 1.1.1, or breach of warranty in connection with the construction of the Improvements, including causes of action arising in tort, contract, fraud or concealment of a material fact;

      1.1.13   All of Mortgagor's right, title, and interest in and to any and all units, common elements, declarant rights, development rights, and any other rights relating to the Premises or the Improvements, whether now existing or subsequently arising, under any and all condominium declarations, covenants, conditions, and restrictions, development agreements, or other agreements or declarations now existing or later executed relating to the Premises or Improvements, and all Laws now existing or later enacted relating to the Premises or

Improvements, including those relating to condominiums, and all rights of Mortgagor in connection with any owner's association, condominium association, architectural control committee, or similar association or committee, established in connection with the Project, including Mortgagor's rights and powers to elect, appoint, and remove officers and directors of any such associations or committees;

    **1.1.14**   All of Mortgagor's right, title, and interest in and to any swap transaction or interest rate agreement or interest rate hedging program through the purchase by Mortgagor of an interest rate swap, cap, or such other interest rate protection product (an agreement evidencing any such arrangement, an *"Interest Rate Agreement"*), all whether now or hereafter entered into by Mortgagor with respect to the Loan, including any and all amounts payable to Mortgagor, any deposit account or accounts with Lender in the name of Mortgagor for deposit of payments to Mortgagor in connection with any Interest Rate Agreement or swap transaction, and any and all funds now or hereafter on deposit therein;

    **1.1.15**   All of Mortgagor's right, title, and interest in and to (i) all agreements (except for Leases), commitments, and options now or hereafter existing with respect to the construction, ownership, maintenance, operation, management, or use of the Premises or Improvements, including the Property Management Agreement between RH East Lake LLC and the Lynd Company dated September 16, 2019 and assigned to Mortgagor by Assignment and Assumption of Property Management Agreement dated July 28, 2021 executed and delivered by RH East Lake LLC to Mortgagor; (ii) all plans, specifications, drawings, and reports now existing or hereafter prepared with respect to the Premises or Improvements, including architectural and engineering plans, specifications and drawings, soils reports, environmental reports, and all other property reports; (iii) the Project Licenses (hereinafter defined); (iv) any and all present and future amendments, modifications, supplements, and addenda to any of the items described in clauses (i) through (iii) of this Section 1.1.15; and (v) any and all guarantees, warranties (including building or manufacturer's warranties) and other undertakings (including payment and performance bonds) now existing or hereafter entered into or provided with respect to any of the items described in clauses (i) through (iv) of this Section 1.1.15 (collectively, the *"Contracts"*);

    **1.1.16**   All of Mortgagor's right, title, and interest in and to all trade names, trademarks, logos and other materials used to identify or advertise, or otherwise relating to the Premises or Improvements;

    **1.1.17**   To the fullest extent not prohibited by applicable Laws, all of Mortgagor's rights in all building permits, governmental permits, licenses, variances, applications, conditional or special use permits, and other authorizations now or hereafter issued in connection with the construction, development, ownership, operation, management, leasing or use of the Premises or Improvements (the *"Project Licenses"*);

    **1.1.18**   All books, records, and data pertaining to any and all of the property described above, however recorded, stored, or maintained, including digital, electronic, and computer-readable data and any computer hardware or software necessary to access and process such data (*"Books and Records"*); and

    **1.1.19**   All products, profits, rents (*"Rents"*), proceeds of, additions and accretions to, substitutions, and replacements for, and changes in any of the property described above.

To have and to hold such Property unto Lender and Lender's successors and assigns, forever; Mortgagor hereby releasing, relinquishing, and waiving, to the fullest extent allowed by law, all rights and benefits, if any, under and by virtue of the homestead exemption laws of the property jurisdiction, if applicable. The maximum amount of the Secured Obligation outstanding at any time and from time to time that is secured by this Security Instrument as a mortgage and as a pledge of leases and rents shall be limited to an amount equal to the original principal balance of the Note multiplied by three (3), inclusive of principal, interest, late charges, default interest, prepayment premiums, additional advances pursuant to this Security Instrument, costs, expenses and attorneys' fees.

Mortgagor represents and warrants that Mortgagor is lawfully seized of the Property and has the right, power and authority to mortgage, grant, pledge, hypothecate, convey and collaterally assign the Property, and that the Property is not encumbered by any lien other than Permitted Exceptions (as defined in the Loan Agreement). Mortgagor covenants that Mortgagor will warrant and defend the title to the Property against all claims and demands other than Permitted Exceptions.

1.2     **Secured Obligations.**

1.2.1   Mortgagor makes the grant, conveyance, assignment, and mortgage set forth above, and grants the security interests and liens set forth below for the purpose of securing the following obligations (the *"Secured Obligations"*) in any order of priority that Lender may choose:

1.2.1.1   Payment of all obligations at any time owing under a promissory note of even date herewith, payable by Mortgagor, as maker, in the stated principal amount of Twenty Two Million Four Hundred Thousand Dollars ($22,400,000.00) to the order of Lender, having a Maturity Date of January 28, 2023 (as it may be amended, restated, modified, or extended, the *"Note"*), subject to Mortgagor's exercise of any extension options available under the terms and conditions of the Loan Agreement (hereinafter defined);

1.2.1.2   Payment and performance of all obligations of Mortgagor under this Security Instrument;

1.2.1.3   Payment and performance of all obligations of Mortgagor under a Loan Agreement of even date herewith between Mortgagor, as "Mortgagor," and Lender, as "Lender" (as it may be amended, restated, or modified, the *"Loan Agreement"*);

1.2.1.4   Payment and performance of any obligations of Mortgagor under any Loan Documents that are executed by Mortgagor, but specifically excluding any obligations of Mortgagor under any guaranty of the Secured Obligations or any separate indemnity agreement executed in connection with the Loan (each an *"Indemnity Agreement"*), including any environmental, hazardous materials, or building access indemnity agreement;

1.2.1.5   Payment and performance of all obligations of Mortgagor arising from any Interest Rate Agreements, including any Cash Settlement Amount or any payments on Early Termination payable by Mortgagor under any Swap Transaction or Confirmation. Capitalized terms used in this subsection not otherwise defined in this Security

Instrument are defined in the *2006 ISDA Definitions* published by the International Swap Dealers Association, Inc.;

    **1.2.2**    Payment and performance of all other obligations that Mortgagor or any successor in ownership of all or part of the Property may agree to pay and/or perform for the benefit of Lender, when a writing evidences the parties' agreement that the advance or obligation is secured by this Security Instrument;

    **1.2.2.1**    Payment and performance of all modifications, amendments, restatements, extensions, and renewals, however evidenced, of any of the foregoing Secured Obligations; and

    **1.2.2.2**    Payment and performance of all future advances with respect to any of the foregoing Secured Obligations.

    **1.2.3**    All persons who may have or acquire an interest in all or any part of the Property will be considered to have notice of, and will be bound by, the terms of the Secured Obligations and each other agreement or instrument made or entered into in connection with each of the Secured Obligations. Such terms include any provisions in the Note or the Loan Agreement that permit borrowing, repayment and re-borrowing, or that provide for a change in the interest rate of any Secured Obligation.

    **1.2.4**    This Security Instrument shall not secure any obligations of guarantors or other third parties under any guaranties of the Secured Obligations or any Indemnity Agreement.

**2.**    **PLEDGE OF LEASES AND RENTS; APPOINTMENT OF KEEPER; LENDER IN POSSESSION.**

    **2.1**    **Pledge of Leases and Rents.**  To secure to Lender the repayment of the Secured Obligations, and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Mortgagor contained in the Loan Documents, Mortgagor hereby pledges to Lender all of Mortgagor's right, title and interest in and to all current and future Leases and Rents. This pledge of rents and leases is made pursuant to Louisiana Civil Code Articles 3168 through 3175 and Lender shall be entitled to all the security rights, remedies and benefits offered thereby and under Louisiana Civil Code Articles 3160 through 3167 except as otherwise provided herein.

    **2.2**    **Mortgagor's Rights Prior to Event of Default.**  Until an Event of Default has occurred and is continuing, but subject to the limitations set forth in the Loan Documents, Mortgagor shall have the right to exercise all rights, power and authority granted to Mortgagor under the Leases (including the right, power and authority to modify the terms of any Lease, extend or terminate any Lease, or enter into new Leases, subject to the limitations set forth in the Loan Documents), and to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender, and to apply all Rents to pay the monthly debt service payments and the other amounts then due and payable under the other Loan Documents, including Impound Amounts, if any, and to pay the current costs and expenses of managing, operating and maintaining the Property, including utilities and Impositions (to the extent not included in Impound Amounts), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing (and no event

which, with the giving of notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing), the Rents remaining after application pursuant to the preceding sentence may be retained and distributed by Mortgagor free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument.

2.3    **Lender's Rights After Event of Default.** If an Event of Default has occurred and is continuing, without the necessity of Lender entering upon and taking and maintaining control of the Property directly, by a keeper, or by any other manner or proceeding permitted by the laws of the Property jurisdiction, Lender shall immediately have all rights, powers and authority granted to Mortgagor under any Lease (including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease) and, without notice, Lender shall be entitled to all Rents as they become due and payable, including Rents then due and unpaid.  During the continuance of an Event of Default, Mortgagor authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Property to pay all Rents to, or as directed by, Lender, and Mortgagor shall, upon Mortgagor's receipt of any Rents from any sources, pay the total amount of such receipts to Lender.  Although the foregoing rights of Lender are self-effecting, at any time during the continuance of an Event of Default, Lender may make demand for all Rents, and Lender may give, and Mortgagor hereby irrevocably authorizes Lender to give, notice to all tenants of the Property instructing them to pay all Rents to Lender.  No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Mortgagor any amounts that are actually paid to Lender in response to such a notice.  Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit.

2.4    **Lender's right to Enter Property After Event of Default.** If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Mortgagor, and even in the absence of waste, enter upon, take and maintain full control of the Property, and may exclude Mortgagor and its agents and employees therefrom, in order to perform all acts that Lender, in its discretion, determines to be necessary or desirable for the operation and maintenance of the Property, including the execution, cancellation or modification of Leases, the collection of all Rents (including through use of a lockbox, at Lender's election), the making of repairs to the Property and the execution or termination of contracts providing for the management, operation or maintenance of the Property, for the purposes of enforcing this pledge of Rents, protecting the Property or the security of this Security Instrument and the Mortgage Loan, or for such other purposes as Lender in its discretion may deem necessary or desirable.

2.5    **Appointment of a Keeper.** Notwithstanding any other right provided Lender under this Security Instrument or any other Loan Document, if an Event of Default has occurred and is continuing, and regardless of the adequacy of Lender's security or Mortgagor's solvency, and without the necessity of giving prior notice (oral or written) to Mortgagor, Lender may apply to any court having jurisdiction for the appointment of a keeper for the Property to take any or all of the actions set forth herein.  If Lender elects to seek the appointment of a keeper for the Property at any time after an Event of Default has occurred and is continuing, Mortgagor, by its execution of this Security Instrument, expressly consents to the appointment of such keeper, including the appointment of a keeper *ex parte*, if permitted by applicable law.  Mortgagor consents to shortened time consideration of a motion to appoint a keeper.  Lender or the keeper, as applicable, shall be entitled to receive a reasonable fee for managing the Property and such fee shall become an additional part of the Secured Obligations.  Immediately upon appointment of a keeper or Lender's

entry upon and taking possession and control of the Property, possession of the Property and all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Property, and all security deposits and prepaid Rents, shall be surrendered to Lender or the keeper, as applicable. If Lender takes possession and control of the Property, Lender may exclude Mortgagor and its representatives from the Property.

**2.6    Limitations on Lender's Obligations.**  The acceptance by Lender of the pledge of the Leases and Rents pursuant to this Section 2 shall not at any time or in any event obligate Lender to take any action under any Loan Document or to expend any money or to incur any expense.  Lender shall not be liable in any way for any injury or damage to person or property sustained by any Person in, on or about the Property.  Prior to Lender's actual entry upon and taking possession and control of the Land and Improvements, Lender shall not be:

**2.6.1**    obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease);

**2.6.2**    obligated to appear in or defend any action or proceeding relating to any Lease or the Property; or

**2.6.3**    responsible for the operation, control, care, management or repair of the Property or any portion of the Property.

The execution of this Security Instrument shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Property is and shall be that of Mortgagor, prior to such actual entry and taking possession and control by Lender of the Land and Improvements.

**2.7    Release of Lender's Liability.**  Lender shall be liable to account only to Mortgagor and only for Rents actually received by Lender.  Lender shall not be liable to Mortgagor, anyone claiming under or through Mortgagor or anyone having an interest in the Property by reason of any act or omission of Lender under this Section 2, and Mortgagor hereby releases and discharges Lender from any such liability to the fullest extent permitted by law, provided that Lender shall not be released from liability that occurs as a result of Lender's gross negligence or willful misconduct as determined by a court of competent jurisdiction pursuant to a final, non-appealable court order.  If the Rents are not sufficient to meet the costs of taking control of and managing the Property and collecting the Rents, any funds expended by Lender for such purposes shall be added to, and become a part of, the principal balance of the Secured Obligations, be immediately due and payable, and bear interest at the Default Rate from the date of disbursement until fully paid.  Any entering upon and taking control of the Property by Lender or the keeper, and any application of Rents as provided in this Security Instrument, shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument or any Loan Document.

**2.8    Lender Not Responsible.**  Under no circumstances shall Lender have any duty to produce Rents from the Property.  Regardless of whether or not Lender, in person or by agent, takes actual possession of the Premises and Improvements, unless Lender agrees in writing to the contrary, Lender is not and shall not be deemed to be:

**2.8.1**   Responsible for the control, care, management or repair of the Property;

**2.8.2**   A "mortgagee in possession" for any purpose;

**2.8.3**   Responsible for performing any of the obligations of the lessor under any Lease;

**2.8.4**   Responsible for any waste committed by Tenants or other occupants of the Property or any other parties, any dangerous or defective condition of the Property, or any negligence in the management, upkeep, repair, or control of the Property;

**2.8.5**   Responsible for any loss sustained by Mortgagor resulting from Lender's failure to lease the Premises or Improvements or from any other act or omission of Lender in managing the Property or administering the Leases except for Lender's gross negligence or willful misconduct; or

**2.8.6**   Liable in any manner for the Property or the use, occupancy, enjoyment, or operation of all or any part of it.

**2.9**   **Leasing.**  Mortgagor shall not lease the Premises or Improvements except in accordance with the provisions of the Loan Agreement.  If Mortgagor becomes aware that any Tenant proposes to do, or is doing, any act or thing that may give rise to any right to set-off against rent, Mortgagor shall (a) take such steps as shall be reasonably calculated to prevent the accrual of any right to a set-off against rent, (b) notify Lender thereof and of the amount of said set-offs, and (c) within twenty (20) days after such accrual, reimburse the Tenant who shall have acquired such right to set-off or take such other steps as shall effectively discharge such set-off and as shall assure that rents thereafter due shall continue to be payable without set-off or deduction.

**2.10**   **Further Actions.**  Mortgagor shall punctually observe, perform, and discharge all obligations, terms, covenants, conditions, and warranties to be performed by Mortgagor pursuant to the Leases.  Mortgagor agrees to execute and deliver, at its sole cost and expense, upon Lender's written request, any documents necessary to cause the specific assignment of any particular Lease or any other document or instrument, the assignment of which is necessary, proper or desirable in Lender's judgment to carry out the purposes of the assignment of Leases and Rents provided for herein, including any consents to such assignment of Leases and Rents.  In addition, Mortgagor shall, at its sole cost and expense, appear in and defend any action or proceeding arising under, growing out of, or in any manner connected with the Leases or the obligations, duties or liabilities of the landlord or any Tenant thereunder, and shall pay on demand all costs and expenses, including attorneys' fees that Lender may incur in connection with Lender's appearance, voluntary or otherwise, in any such action or proceeding, together with interest thereon at the Default Rate from the date incurred by Lender until repaid by Mortgagor.

**2.11**   **Letters of Credit.**  Mortgagor shall notify Lender in writing prior to becoming the beneficiary under any letter of credit supporting any of the Leases, or otherwise in connection with the Property, and will take all actions, and execute all documents, necessary or appropriate to give Lender control (as defined in the Uniform Commercial Code) of such letter of credit and all letter of credit rights thereunder and, if so required by Lender, to deliver the letter of credit to Lender or constitute Lender the transferee beneficiary of such letter of credit.

3.    SECURITY ASSIGNMENT OF CONTRACTS.

**3.1    Assignment.**  To the fullest extent not prohibited by applicable Laws, Mortgagor hereby grants, assigns, and pledges to Lender all of Mortgagor's right, title and interest in and to all of the Contracts as security for the Secured Obligations.

**3.2    Mortgagor's Covenants.**  Mortgagor hereby covenants and represents to Lender as follows:

**3.2.1**    Mortgagor shall punctually observe, perform, and discharge each and every obligation, covenant, condition, and agreement of the Contracts to be performed by Mortgagor.

**3.2.2**    Mortgagor shall enforce performance by the other part(y)(ies) to any Contract, of each and every obligation, covenant, condition and agreement to be performed by such other part(y)(ies).

**3.2.3**    Mortgagor shall not assign, sell, pledge, transfer, mortgage, hypothecate or otherwise encumber its interests in any Contract. In addition, Mortgagor shall not consent to, suffer or permit any future assignment or transfer of any material Contract by any party without Lender's prior written consent in each instance.

**3.2.4**    Mortgagor shall not materially alter, amend, modify or terminate any of the Contracts without the prior written consent of Lender, not to be unnecessarily withheld, except for service contracts entered into in the ordinary course of business.

**3.2.5**    Upon Lender's request following an Event of Default, Mortgagor shall deliver to Lender all of the original Contracts or certified copies thereof and all modifications, extensions, renewals, amendments, and other agreements relating thereto.

**3.2.6**    Mortgagor shall execute and deliver, at its sole cost and expense, upon Lender's written request, any documents necessary to cause the specific assignment of any particular Contract or any other document or instrument, the assignment of which is necessary, proper or desirable in Lender's judgment to carry out the purposes of the assignment of Contracts provided for herein, including any consents to such assignment of Contracts.

**3.3    Lender's Remedies upon Default.**  Upon the occurrence of an Event of Default, Lender, at its sole option, and without any notice whatsoever to Mortgagor, and without assuming any of the obligations of Mortgagor under the Contracts, shall have the right (but not the obligation) and is hereby authorized to: (a) cure any default of Mortgagor in such manner and to such extent as Lender may deem necessary to protect the security hereof, (b) appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Lender; (c) demand, receive, and enforce payment of all amounts that may be or become payable to Mortgagor under any of the Contracts; (d) exercise and enforce by suit or otherwise any remedies against other parties to the Contracts for breaches of the terms and conditions of the Contracts; (e) enter into other contracts or agreements, in the name of either Mortgagor or Lender, with such third parties as Lender may in its discretion select, and upon such terms and conditions as Lender in its reasonable discretion may determine; (f) compromise amounts due under the Contracts; (g) maintain or

dismiss suits with respect to the Contracts; (h) delegate any and all rights and powers given to Lender by the assignment of Contracts provided for herein; (i) perform any obligation, covenant or agreement of Mortgagor under any of the Contracts, and, in exercising any such powers, paying all necessary costs and expenses, employing counsel and incurring and paying attorneys' fees; (j) appear in any bankruptcy, insolvency or reorganization proceeding involving any party to the Contracts and collect any award or payment due Mortgagor pursuant to any such proceeding; and/or (k) use such measures, legal or equitable as in its discretion may carry out and effectuate the terms and intent of the assignment of Contracts provided for herein. All such actions shall be taken at the expense of Mortgagor.

3.4    **No Liability of Lender.** Lender shall not be obligated to perform or discharge, nor does it hereby undertake to perform or discharge, any obligation, duty or liability under any of the Contracts, or by reason of the assignment of Contracts provided for herein. Further, nothing in this Security Instrument shall obligate Lender to assume any obligations under any Contract, unless and until Lender becomes the owner of the Property and affirmatively assumes a particular Contract in writing.

3.5    **Instructions to Contracting Parties.** Upon an Event of Default, the assignment of Contracts provided for herein constitutes an irrevocable direction to and full authority from Mortgagor to any other party to any Contract to pay directly to Lender, upon Lender's request, all amounts that may be or become due to Mortgagor. No proof of the occurrence of an Event of Default shall be required. Any such contracting party is hereby authorized by Mortgagor to rely upon and comply with any notice or demand by Lender for the payment to Lender of any amounts that may be or become due under its Contract, or for the performance of any obligations under such Contract.

3.6    **Application of Income.** Notwithstanding any other provision of this Security Instrument, the payments, proceeds and income collected by Lender with respect to the Contracts may be applied, in whatever order Lender in its discretion may determine, to the payment of any costs and expenses, to the payment of taxes, special assessments and insurance premiums that become due and delinquent on the Property, to the Secured Obligations, or to any liens or encumbrances on the Property or any personal property of Mortgagor.

3.7    **Interpretation.** The terms of any separate assignment of Contracts or assignment of construction documents shall supersede and control over any inconsistent terms of the assignment of Contracts provided for herein.

4.    **SECURITY AGREEMENT AND FILING.**

4.1    **Grant of Security Interest.** To secure to Lender, the repayment of the Secured Obligations, and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Mortgagor contained in the Loan Documents, Mortgagor hereby pledges, assigns, and grants to Lender a continuing security interest in any or all of that portion of the Property in which security interests may be granted under the Uniform Commercial Code (the "*UCC*") in the State of Louisiana as amended from time to time (the "*UCC Collateral*"). This Security Instrument constitutes a security agreement and a financing statement under the UCC. This Security Instrument also constitutes a financing statement pursuant to the terms of the UCC with respect to any part of the Property that is or may become a Fixture under applicable law, and

will be recorded as a "fixture filing" in accordance with the UCC. Mortgagor hereby authorizes Lender to file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest without the signature of Mortgagor. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the UCC or otherwise provided at law or in equity, in addition to all remedies provided by this Security Instrument and in any Loan Document. Lender may exercise any or all of its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability or validity of Lender's other remedies. For purposes of the UCC, the debtor is Mortgagor and the secured party is Lender. The name and address of the debtor and secured party are set forth after Mortgagor's signature below which are the addresses from which information on the security interest may be obtained.

**4.2    Mortgagor Representations and Warranties.** Mortgagor represents and warrants that: (1) Mortgagor maintains its chief executive office at the location set forth after Mortgagor's signature below, and Mortgagor will notify Lender in writing of any change in its chief executive office within five (5)days of such change; (2) Mortgagor is the record owner of the Property; (3) Mortgagor's state of incorporation, organization, or formation, if applicable, is as set forth on Page 1 of this Security Instrument; (4) Mortgagor's exact legal name is as set forth on Page 1 of this Security Instrument; (5) Mortgagor's organizational identification number, if applicable, is as set forth after Mortgagor's signature below; (6) Mortgagor is the owner of the UCC Collateral subject to no liens, charges or encumbrances other than the lien hereof; (7) except as expressly provided in the Loan Agreement, the UCC Collateral will not be removed from the Property without the consent of Lender; and (8) no financing statement covering any of the UCC Collateral or any proceeds thereof is on file in any public office except pursuant hereto.

**4.3    After Acquired Property.** All property of every kind acquired by Mortgagor after the date of this Security Instrument which by the terms of this Security Instrument shall be subject to the lien, pledge and the security interest created hereby, shall immediately upon the acquisition thereof by Mortgagor and without further conveyance or assignment become subject to the lien and security interest created by this Security Instrument. Nevertheless, Mortgagor shall execute, acknowledge, deliver and record or file, as appropriate, all and every such further deeds of trust, mortgages, pledges, deeds to secure debt, security agreements, financing statements, assignments and assurances as Lender shall require for accomplishing the purposes of this Security Instrument and to comply with the rerecording requirements of the UCC.

**4.4    Financing Statement.**

**4.4.1** Mortgagor shall cooperate with Lender in any way necessary to perfect and continue the perfection of Lender's security interest in any part of the Property.

**4.4.2** If any financing statement or other document is filed in the records normally pertaining to personal property, that filing shall never be construed as in any way derogating from or impairing this Security Instrument as a lien on the Property or the rights or obligations of the parties under it.

**4.4.3** Mortgagor shall not terminate any financing statement filed to perfect Lender's security interest without Lender's express written consent.

**4.5     Representations, Warranties, and Covenants.**

      **4.5.1**    Mortgagor represents and warrants to Lender that (a) Mortgagor's exact legal name is as set forth on the signature page of this Security Instrument, which name is stated to be Mortgagor's name on the public organic record most recently filed with Mortgagor's jurisdiction of organization; (b) Mortgagor is an organization of the type, and is organized in the jurisdiction, set forth on the signature page of this Security Instrument; (c) Mortgagor's organizational identification number, if any, is set forth on the signature page of this Security Instrument; (d) Mortgagor's address set forth in the preamble of this Security Instrument is its principal place of business and the location of its chief executive offices and the address at which it will keep its Books and Records.

      **4.5.2**    Mortgagor shall not, without prior written notice to Lender: (a) change the location of its principal place of business or chief executive office from that specified in the preamble of this Security Instrument; (b) change its name, identity or corporate structure in a manner that would affect the perfection or priority of Lender's financing statement(s) against all or any portion of the Property without further action by Lender; or (c) change the jurisdiction of its incorporation or organization.  In addition, Mortgagor shall keep all Property that is personal property, to the extent not delivered to Lender, at the Project or such other locations as have been disclosed in writing to Lender, and Mortgagor shall not remove the personal property from such locations without providing written notice to Lender of the new location of such personal property.

      **4.5.3**    Mortgagor will fully and punctually perform any duty required of it under or in connection with any of the Property that is personal property, and will not take any action that would impair, damage or destroy Lender's rights to such Property or the value thereof.  Mortgagor will timely take any and all action reasonably required to maintain the continued performance by every other party to any agreement comprising the Property.

**4.6     Reserved.**

**4.7     Reserved.**

**5.     RIGHTS AND DUTIES OF THE PARTIES.**

    **5.1     Representations and Warranties.**    Mortgagor represents, warrants, and covenants that:

      **5.1.1**    Mortgagor lawfully possesses and holds indefeasible fee simple title to all of the Premises and Improvements, subject only to the Permitted Exceptions;

      **5.1.2**    Mortgagor has or will have good title to all Property other than the Premises and Improvements, free and clear of any security agreements, reservations of title, or conditional sales contracts, and there is no financing statement affecting such personal property on file in any public office, except for Permitted Exceptions;

      **5.1.3**    True, correct and complete copies of the Contracts and Leases have been delivered to Lender, including all amendments, modifications, exhibits and addenda thereto;

**5.1.4**   Mortgagor has the full and unlimited power, right and authority to encumber the Property and assign the Leases, Rents, and Contracts; there are no outstanding assignments of the Leases, Rents, or Contracts; Mortgagor is the absolute owner of the landlord's interest in the Leases; and Mortgagor has performed no act or executed any other instrument that might prevent Lender from enjoying and exercising any of its rights and privileges evidenced by this Security Instrument with respect to the Leases, Rents, and Contracts;

**5.1.5**   No Rents have been discounted, released, waived, compromised or otherwise discharged except for prepayment of Rent of not more than one (1) month prior to the accrual thereof;

**5.1.6**   To the best of Mortgagor's knowledge, no default exists under any of the Leases or Contracts by any party and no fact or circumstance exists under any of the Leases or Contracts that, with the lapse of time or giving of notice or both, would constitute a default by any party under such Leases or Contracts;

**5.1.7**   The Leases and Contracts were duly executed, are in full force and effect, and are the valid and binding obligations of the parties thereto and are enforceable in accordance with their respective terms;

**5.1.8**   Upon recording of this Security Instrument in the real estate records of the county where the Premises are located and the filing of a UCC financing statement in the applicable Uniform Commercial Code jurisdiction, this Security Instrument will create a first and prior lien on the Property;

**5.1.9**   The Property includes all property and rights that may be reasonably necessary or desirable to promote the present and any reasonable future beneficial use and enjoyment of the Premises and Improvements; and

**5.1.10**   To Mortgagor's knowledge, the Project Licenses held by Mortgagor include all licenses and permits necessary for the occupancy and operation of the Project; the Project Licenses are in full force and effect; Mortgagor has at all times complied with all material terms and requirements of the Project Licenses, and Mortgagor has received no notices contrary to the foregoing; no suspension, revocation or cancellation of the Project Licenses is threatened, and no event has occurred, nor do any circumstances exist that may (a) constitute or result in a violation of or a failure to comply with any material term or requirement of any Project License, or (b) result in the revocation, withdrawal, suspension, cancellation or termination of any Project License; and all applications required to have been filed for the renewal of any Project License have been duly filed on a timely basis with the appropriate authority, and all other required filings have been made with respect to the Project Licenses on a timely basis with the appropriate authority.

**5.2**   **Performance of Secured Obligations.**   Mortgagor shall promptly pay and perform each Secured Obligation in accordance with its terms.

**5.3**   **Use of Property.**   Unless required by applicable Laws or unless Lender has otherwise agreed in writing, Mortgagor shall not allow changes in the use for which all or any part of the Property was intended at the time this Security Instrument was executed. Mortgagor shall not initiate or acquiesce to a change in the zoning classification of the Property without Lender's

prior written consent. Mortgagor shall not consent to the submission of the Property, or any portion thereof, to any condominium regime or improvement district without Lender's prior written consent.

**5.4    Taxes, Assessments, Liens, Charges and Encumbrances.**  Mortgagor shall pay, prior to delinquency, all taxes, levies, charges, assessments, water and sewer rates, rents insurance premiums, charges and impositions, attributable to the Property.  Mortgagor shall immediately discharge (or bond over as provided below) any lien on the Property that is not a Permitted Exception, and promptly notify Lender if a mechanic's lien is filed against the Property. Mortgagor shall have the right to contest in good faith and with reasonable diligence the validity of any such lien or claim if Mortgagor posts a statutory lien bond that removes such lien from title to the Project within twenty (20) days after the earlier of (a) Mortgagor's knowledge that the lien exists or (b) written notice by Lender to Mortgagor of the existence of the lien. Failure to remove the lien from title to the Project within such twenty-day period shall constitute an immediate Event of Default.

**5.5    Damages and Insurance and Condemnation Proceeds.**  In the event of any casualty or condemnation of the Property, the applicable provisions of the Loan Agreement shall govern.

**5.6    Maintenance and Preservation of Property.**

**5.6.1**    Mortgagor shall insure the Property as required by the Loan Agreement and keep the Property, including improvements, fixtures, equipment, machinery and appliances, in good repair and shall replace improvements, fixtures, equipment, machinery and appliances on the Property owned by Mortgagor when necessary to keep such items in good condition and repair.

**5.6.2**    Neither Mortgagor nor any Tenant shall remove or demolish the Property or any part of it, or alter, restore or add to the Property, or initiate or allow any change or variance in any zoning or other land use classification that affects the Property or any part of it, except as permitted or required by the Loan Agreement or with Lender's express prior written consent in each instance.

**5.6.3**    If all or part of the Improvements becomes damaged or destroyed, Mortgagor shall promptly and completely repair and/or restore the Improvements in a good and workmanlike manner in accordance with sound building practices, regardless of whether Net Claims Proceeds are available for disbursement pursuant to the terms of the Loan Agreement.

**5.6.4**    Mortgagor shall take all action necessary to keep the Property at all times in compliance with: (a) all applicable Laws and all orders of any Governmental Authority, whether now existing or later to be enacted and whether foreseen or unforeseen, including the Americans with Disabilities Act; and (b) all public and private covenants, conditions, restrictions and equitable servitudes affecting the Property.  Mortgagor shall not bring or keep any article on the Property or cause or allow any condition to exist on the Property if doing so could invalidate or would be prohibited by any insurance coverage required to be maintained by Mortgagor on the Property or any part of it under the Loan Agreement.

**5.6.5**    Mortgagor shall not commit waste or permit impairment or deterioration of the Property.

**5.6.6**    Mortgagor shall not abandon the Property.

**5.6.7**    Mortgagor shall give notice in writing to Lender, appear in and defend any action or proceeding purporting to affect the Property, the security of this Security Instrument or the rights or powers of Lender, except for any such action or proceeding caused by the gross negligence or intentional misconduct of Lender.

**5.6.8**    Mortgagor shall perform all other acts that from the character or use of the Property may be reasonably necessary to maintain and preserve its value.

**5.7    Preservation of Project Licenses.**

**5.7.1**    Mortgagor shall, within twenty (20) days after demand by Lender, deliver to Lender a written statement certifying any condition or state of facts in connection with the Project Licenses that is reasonably requested by Lender;

**5.7.2**    Mortgagor shall not take any action or make any omission that would (a) constitute or result in a violation of or a failure to comply with any material term or requirement of any Project License, or (b) result in the revocation, withdrawal, suspension, cancellation or termination of any Project License;

**5.7.3**    Mortgagor shall cause all filings for the renewal of any Project License to be made on a timely basis with the appropriate authority; and

**5.7.4**    Mortgagor shall notify Lender immediately of any notice or claim known to Mortgagor alleging a material violation of any Project License or threatening to revoke, withdraw, suspend, cancel or terminate any Project License, and Mortgagor shall take all action necessary to defend such allegation and, as applicable, reinstate such Project License.

**5.8    Releases, Extensions, Modifications and Additional Security.**    From time to time, Lender may perform any of the following acts without incurring any liability, giving notice to any person, or prejudicing its rights under this Security Instrument or any other Loan Document:

**5.8.1**    Release any person liable for payment of any Secured Obligation;

**5.8.2**    Extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation;

**5.8.3**    Accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security;

**5.8.4**    Alter, substitute or release any property securing the Secured Obligations;

**5.8.5**    Consent to the making of any plat or map of the Property or any part of it;

**5.8.6**   Join in granting any easement or creating any restriction affecting the Property;

**5.8.7**   Join in any subordination or other agreement affecting this Security Instrument or the lien of it;

**5.8.8**   Apply any other security for the Secured Obligations held by Lender; and

**5.8.9**   Release the Property or any part of it.

**5.9   Protection of Lender's Security.**

**5.9.1**   If there occurs a Default or Event of Default under this Security Instrument or the other Loan Documents, or if any action or proceeding is commenced that affects the Property or title thereto or the interest of Lender therein, including eminent domain, insolvency, enforcement of local Laws, or arrangements or proceedings involving a debtor in bankruptcy or a decedent, then Lender, at Lender's option, may cure any breach or default of Mortgagor, make such appearances, disburse such sums, enter upon the Premises and Improvements, and/or take such action as Lender deems necessary, in its sole discretion to protect Lender's security and the first priority lien of this Security Instrument.   Such actions may include, without limitation: (a) appearing in and/or defending any action or proceeding that purports to affect the security of, or the rights or powers of Lender under, this Security Instrument; (b) paying, purchasing, contesting, or compromising any encumbrance, tax, assessment, charge, lien or claim of lien that is or, in Lender's reasonable judgment may be, senior in priority to this Security Instrument, such judgment of Lender to be conclusive as among the parties to this Security Instrument; (c) purchasing fuel and providing utilities; (d) obtaining insurance and/or paying any premiums or charges for insurance required to be carried under the Loan Agreement; (e) otherwise caring for and incurring expenses to protect any and all of the Property; (f) employing counsel, accountants, contractors, and other appropriate persons to assist Lender; and/or (g) such other actions reasonably necessary to protect Lender's security.

**5.9.2**   Nothing contained in this Security Instrument shall require Lender to incur any expense or take any action hereunder.

**5.9.3**   The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of the right of Lender to accelerate the maturity of any of the Secured Obligations.  Lender's receipt of any Claims Proceeds shall not operate to cure or waive any Default or Event of Default.

**5.10   Release and Reconveyance.**  When all of the Secured Obligations have been paid in full and all fees and other sums owed by Mortgagor under this Security Instrument and the other Loan Documents have been received, Lender shall release this Security Instrument and release the lien created hereby, and release all notes and instruments evidencing the Secured Obligations. Mortgagor shall pay any reasonable costs of preparation and recordation of such releases.

### 5.11    Compensation, Exculpation, Indemnification.

#### 5.11.1    Compensation.

**5.11.1.1**    Mortgagor agrees to pay or reimburse Lender for all amounts advanced by Lender in connection with Section 5.9 and Section 5.10 hereof.

**5.11.1.2**    Mortgagor agrees to pay fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Lender when the law provides no maximum limit, for any services that Lender may render in connection with this Security Instrument, including exercising their rights with respect to the Leases, Rents, and Contracts, providing a statement of the Secured Obligations, or releasing the lien of this Security Instrument. Mortgagor also agrees to pay or reimburse all of Lender's costs and expenses that may be incurred in rendering any such services, including all costs of administering the Leases and Contracts.

**5.11.1.3**    Whether or not any lawsuit is filed, Mortgagor agrees to pay or reimburse Lender, as applicable, for all costs, expenses, or other advances that may be incurred or made by Lender in any litigation or proceeding affecting this Security Instrument, the Loan Documents, or the Property (including probate, discretionary review, bankruptcy, and on appeal), and any efforts to enforce any terms of this Security Instrument, exercise any rights or remedies afforded to Lender hereunder, under the other Loan Documents, or at law or in equity, or defend any action or proceeding arising under or relating to this Security Instrument, including reasonable attorneys' fees and other Legal Expenses, receiver's fees, and any cost of evidence of title.

**5.11.1.4**    Mortgagor further agrees to pay all costs, expenses, and other advances that may be incurred or made by Lender in connection with one or more Foreclosure Sales (hereinafter defined) of the Property.

**5.11.1.5**    All such expenditures, advances, costs, and expenses made or incurred by Lender shall be immediately due and payable by Mortgagor, with interest thereon at the Default Rate, and shall be secured by this Security Instrument.

#### 5.11.2    Exculpation. Lender shall not be directly or indirectly liable to Mortgagor or any other person as a consequence of any of the following, and Mortgagor expressly waives and releases all liability of the types described below, and agrees not to assert or impose any such liability against or upon Lender:

**5.11.2.1**    Lender's exercise of or failure to exercise any rights, remedies or powers granted to Lender in this Security Instrument or any of the other Loan Documents;

**5.11.2.2**    Lender's failure or refusal to perform or discharge any obligation or liability of Mortgagor under any agreement related to the Property or under this Security Instrument, including any of the Leases or Contracts; or

**5.11.2.3**    Any loss sustained by Mortgagor or any third party resulting from Lender's failure to lease the Property, or from any other act or omission of Lender in managing the Property, after an Event of Default, unless the loss is caused solely by the willful misconduct or bad faith of Lender.

**5.11.3  Indemnification.**  MORTGAGOR AGREES TO HOLD HARMLESS, DEFEND, AND INDEMNIFY LENDER FROM AND AGAINST ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, CAUSES OF ACTION, JUDGMENTS, COURT COSTS, ATTORNEYS' FEES AND OTHER LEGAL EXPENSES, COST OF EVIDENCE OF TITLE, COST OF EVIDENCE OF VALUE, AND OTHER COSTS AND EXPENSES THAT EITHER OF THEM MAY SUFFER OR INCUR (EXCEPT TO THE EXTENT ARISING FROM LENDER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT):

5.11.3.1  In performing any act required or permitted by this Security Instrument or any of the other Loan Documents or by law or in equity;

5.11.3.2  Arising out of or resulting from the assignment of Leases and Rents as set forth above, including claims or demands for security deposits from Tenants deposited with Mortgagor, and from and against any and all claims and demands whatsoever that may be asserted against Lender to satisfy any obligations of the landlord under the Leases;

5.11.3.3  Arising out of or resulting from the assignment of Contracts as set forth above, including the exercise or enforcement of any of the rights of Mortgagor thereunder;

5.11.3.4  Because of any failure of Mortgagor to perform any of its obligations;

5.11.3.5  Because of any alleged obligation of or undertaking by Lender to perform or discharge any of the representations, warranties, conditions, covenants, or other obligations in any document relating to the Property other than the Loan Documents;

5.11.3.6  By reason of (a) suspension, revocation, cancellation, or termination of any Project License or (b) any alleged obligation or undertaking on the part of Lender to perform or discharge any of the terms of, or any agreements or Laws pertaining to, the Project Licenses; or

5.11.3.7  By reason of Lender's security interest in the Project Licenses.

Such indemnity shall include all costs, expenses and reasonable attorneys' fees incurred by Lender in connection with such matters, together with interest on the indemnified liabilities at the Default Rate from the date paid or incurred by Lender until repaid by Mortgagor, and shall be immediately due and payable to Lender by Mortgagor upon demand and shall be secured by this Security Instrument.  This agreement by Mortgagor to hold harmless, indemnify, and defend Lender shall survive the release and cancellation of any or all of the Secured Obligations, the full or partial release of this Security Instrument, and any foreclosure or other enforcement of this Security Instrument, or transfer by deed in lieu thereof.

**5.11.4  Payment by Mortgagor.**  Mortgagor shall satisfy all obligations to pay money arising under this Security Instrument and the other Loan Documents immediately upon demand by Lender.  Each such obligation shall be added to, and considered to be part of, the principal of the Note, and shall bear interest at the Applicable Rate or Default Rate, as applicable, from the date the obligation arises.

**5.12    Defense and Notice of Claims and Actions.**  At Mortgagor's sole expense, Mortgagor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Security Instrument and the rights and powers of Lender created under it, against all adverse claims.  Mortgagor shall give Lender prompt notice in writing if any claim is asserted that does or could affect any such matters, or if any action or proceeding is commenced that alleges or relates to any such claim.

**5.13    Subrogation.**  Lender shall be subrogated to the liens of all encumbrances, whether released of record or not, that are discharged in whole or in part by Lender in accordance with this Security Instrument or with the proceeds of any loan secured by this Security Instrument.

**5.14    Site Visits, Observation and Testing.**  Lender and its agents and representatives shall have the right at any reasonable time to enter and visit the Property for the purpose of performing appraisals, observing the Property, taking and removing soil or groundwater samples, and conducting tests on any part of the Property, including Phase I environmental assessments. Lender has no duty, however, to visit or observe the Property or to conduct tests, and no site visit, observation or testing by Lender, its agents or representatives shall impose any liability on any of Lender, its agents or representatives.  In no event shall any site visit, observation or testing by Lender, its agents or representatives be a representation that Hazardous Material is or is not present in, on or under the Property, or that there has been or shall be compliance with any Laws pertaining to Hazardous Material or any other applicable Laws.  Neither Mortgagor nor any other party is entitled to rely on any site visit, observation or testing by any of Lender, its agents or representatives.  Neither Lender, nor its agents or representatives owe any duty of care to protect Mortgagor or any other party against, or to inform Mortgagor or any other party of, any Hazardous Material or any other adverse condition affecting the Property.  Prior to an Event of Default, Lender shall give Mortgagor reasonable notice before entering the Property, and Lender shall make reasonable efforts to avoid interfering with Mortgagor's use of the Property in exercising any rights provided in this Section.  Mortgagor shall bear all expense of any site visit, observation or testing.

**5.15    Books and Records.**  Mortgagor agrees to maintain full and accurate records and books of account prepared in a manner reasonably acceptable to Lender covering any of the Property and to deliver, upon request, to Lender such of the books as relate to the Property, including all invoices, shipping documents, contracts, orders, order acknowledgments, correspondence and other instruments and papers in Mortgagor's possession.  Lender shall at all reasonable times have free access to Mortgagor's ledgers, books of account and other written records evidencing or relating to the Property and the right to make and retain copies or memoranda of the same.

## 6.    ENVIRONMENTAL AND BUILDING LAWS.

### 6.1    Definitions.

**6.1.1    "*Building Laws*"** means the Fair Housing Act of 1968, as amended from time to time, the Americans With Disabilities Act of 1990, as amended from time to time, all government and private covenants, conditions, and restrictions relating to the Site (hereinafter defined), building code requirements and Laws affecting construction or renovation of improvements on the Site, and all other Laws relating to construction, operation, and maintenance

of the Improvements and the marketing and use of the Premises and Improvements in a non-discriminatory manner.

**6.1.2** *"Environmental Laws"* means the Federal Resource Conservation and Recovery Act of 1976; the Federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980; the Federal Hazardous Materials Transportation Control Act; the Federal Clean Air Act; the Federal Water Pollution Control Act, Federal Clean Water Act of 1977; the Federal Insecticide, Fungicide, and Rodenticide Act, Federal Pesticide Act of 1978; the Federal Endangered Species Act; the Federal Toxic Substances Control Act; the Federal Safe Drinking Water Act; and all other federal, state and local laws, statutes, codes, ordinances, regulations, judgments, orders, injunctions, decrees, covenants, restrictions and standards presently in effect or that may be promulgated in the future relating to (a) the use, release, handling, storage, transportation, clean-up, or other disposal of Hazardous Material, (b) the water quality, air quality, soils quality, or other environmental quality of real property and improvements constructed upon real property, (c) Wetlands, or (d) or related to the protection of endangered species, as amended from time to time.

**6.1.3** *"Environmental Proceeding"* means any lawsuit or proceeding, whether civil (including actions by private parties), criminal, or administrative, relating to the environmental condition of the Site or any Wetlands located thereon, the presence, generation, treatment, storage, or use of Hazardous Material on or about the Site, or the release, disposal, or discharge of Hazardous Material from the Site.

**6.1.4** *"Hazardous Material"* means any waste, pollutants, contaminants, gasoline, crude oil or any fraction thereof, natural gas, natural gas liquids, liquified natural gas, or synthetic gas usable for fuel, petroleum or petroleum products, asbestos, tremolite, anthophylite or actinolite, polychlorinated biphenyls, explosives, radioactive materials, or other chemical, substance, or material that: (a) after release into the environment and upon exposure, ingestion, inhalation, or assimilation, either directly from the environment or indirectly by ingestion through food chains will, or may reasonably be anticipated to, cause death, disease, bodily injury, birth defects, behavior abnormalities, cancer, or genetic abnormalities, or (b) is now or at any time in the future becomes regulated under, or is defined, classified or designated as hazardous, toxic, radioactive or dangerous, or other similar term or category under, any Law applicable to the Site.

**6.1.5** *"Nearby Site"* means real property or bodies of water adjacent to or near the Site that could cause contamination of the Site or could become contaminated with Hazardous Material as a result of construction, operations, or other activities involving Hazardous Material on, over, or under the Site.

**6.1.6** *"Remedial Work"* means all actions necessary or desirable to clean up any Hazardous Material affecting the Site or Nearby Site, including removal, treatment, containment, or any other remedial action required by Governmental Authorities or as otherwise required to restore the Site or Nearby Site to a safe condition in compliance with applicable Laws, including Environmental Laws, and all actions necessary or desirable to modify the Site or marketing materials to comply with applicable Laws, including Building Laws.

**6.1.7** *"Site"* means, for the purposes of this Section, the Premises and all improvements, fixtures, and personal property now or hereafter located thereon, the soil and

groundwater thereof, any streams crossing or abutting the Premises, and any aquifer underlying the Premises.

**6.1.8** *"Wetlands"* has the meaning given in 33 C.F.R. Part 328.3, as amended from time to time.

**6.2    Representations and Warranties.**    Mortgagor makes the following representations and warranties to Lender, which representations and warranties shall be continuing so long as any amount remains owing under the Secured Obligations or Lender retains any interest in the Property:

**6.2.1    Environmental Laws.**    Except for any contamination or environmental condition that may be disclosed in any Environmental Report obtained by Lender prior to the date hereof or that has otherwise been disclosed in writing by Mortgagor to Lender, Mortgagor has no knowledge of: (a) the presence of any Hazardous Material on the Site; (b) any spills, releases, discharges, or disposal of Hazardous Material that have occurred or are presently occurring on or into the Site (whether originating from the Site or Nearby Site) or occurring on or into the Nearby Site (and originating from the Site); (c) any failure of the Site to comply fully with all applicable Environmental Laws; or (d) any present, past, or threatened investigation, inquiry, or Environmental Proceeding or other proceeding relating to the environmental condition of the Site or any Wetlands located thereon, or any event that could give rise to any such investigation, inquiry, or proceeding. To the best of Mortgagor's knowledge, Mortgagor's intended uses of the Site, including any construction, comply fully with all Environmental Laws.

**6.2.2    Building Laws.**    Except for any non-compliance that has been disclosed in writing by Mortgagor to Lender, Mortgagor has no knowledge of any failure of the Site or the plans and specifications for any improvements on the Site to comply fully with all applicable Building Laws. To the best of Mortgagor's knowledge, Mortgagor's intended uses of the Site, including any construction and any plan for marketing the Improvements constructed on the Site comply fully with all Building Laws.

**6.3    No Waivers of Other Indemnifications Relating to Environmental Condition.** Mortgagor has not and will not release or waive the liability of any past or current owner, lessee, Tenant, or operator of the Site, any party who performs work on the Site, or any party who may be responsible for the presence of or removal of Hazardous Material on or from the Site or the Nearby Site. Except as set forth herein or in any separate indemnity agreement executed by Mortgagor in connection with the Loan, Mortgagor has made no prior promises of indemnification to any party relating to the existence or non-existence of Hazardous Material on the Site.

**6.4    Obligation to Comply with Environmental and Building Laws.**    Mortgagor shall construct, operate, and maintain the Site in compliance with any and all Laws relating to public safety and the condition of the environment, including Environmental Laws and Building Laws. Mortgagor covenants that, so long as Mortgagor owns any interest in the Property, Mortgagor and Mortgagor's agents, contractors, authorized representatives, and employees shall not engage in any of the following prohibited activities, and Mortgagor shall use diligent efforts to assure that Mortgagor's invitees and Tenants, and such Tenant's employees, agents, and invitees shall not: (a) cause or permit any release or discharge of Hazardous Material on the Site other than in full compliance with all Environmental Laws; (b) cause or permit any manufacturing, storage,

holding, handling, usage, placement, transporting, spilling, leaking, discharging, or dumping of Hazardous Material in or on any portion of the Site other than in full compliance with all Environmental Laws; (c) suffer or permit any other act upon or concerning the Property that would result in a violation of any Environmental Laws or require any alterations or improvements to be made on the Site under any Environmental Laws; or (d) suffer or permit any other act upon or concerning the Property that would result in a violation of any Building Laws or require any alterations or improvements to be made on the Site under any of the Building Laws.

### 6.5    Obligation to Cure Non-Compliance.

**6.5.1    Notice.** If Mortgagor at any time becomes aware of (a) any Hazardous Material on, or other environmental problem or liability with respect to, the Site or any Nearby Site (and originating from the Site or relating to the development, construction, or operation of the Site), (b) any failure of the Site to comply with any of the Environmental Laws, (c) any failure of the Site or the Improvements, or the marketing efforts and other operations undertaken with respect thereto, to comply with any Building Laws, (d) any lien, action, or notice resulting from a violation of any Environmental Laws or Building Laws, or (e) any Environmental Proceeding affecting the Site, Mortgagor shall immediately notify Lender, and shall thereafter exercise due diligence to ascertain the scope and nature of such condition and provide all notices that applicable Laws require.

**6.5.2    Remediation.** If, upon giving any notice required by Law or for any other reason, one or more Governmental Authorities having jurisdiction over the Site or Nearby Site (as applicable) requires removal or treatment of Hazardous Material from or on the Site or Nearby Site (as applicable) or the making of alterations to the Site (including any Improvements) to conform to Building Laws or Environmental Laws, or such removal, treatment, or alteration is required by Environmental Laws or Building Laws, Mortgagor will: (a) perform or cause to be performed any Remedial Work necessary to comply with Environmental Laws or Building Laws or otherwise required in response to any Environmental Proceedings, and/or (b) attempt, through appropriate legal or administrative proceedings, to appeal, contest, or obtain a stay of enforcement proceedings if Mortgagor believes in good faith that Mortgagor is not required by Law to cure such Hazardous Material condition or to make alterations to comply with Building Laws.  Mortgagor shall provide Lender with copies of all reports, analyses, notices, licenses, approvals, orders, correspondence, and other written materials in its possession or control relating to the environmental condition of the Site and the Nearby Site or Environmental Proceedings immediately upon receipt, completion, or delivery of such materials.

**6.5.3    Liability.** Except for removal or treatment of any Hazardous Material deposited on the Site by Lender, Mortgagor agrees that the amelioration, treatment, containment, or removal of all Hazardous Material that may be discovered on the Site shall be at Mortgagor's sole expense, reserving to Mortgagor any claims for contribution or indemnity that Mortgagor may have against other parties who may be held liable therefor.

### 6.6    Remedial Work.

**6.6.1**    All Remedial Work shall be conducted:

**6.6.1.1**    in a diligent and timely fashion by licensed contractors acting under the supervision of a consulting environmental engineer;

**6.6.1.2**    pursuant to a detailed written plan for the Remedial Work approved by any public or private agencies or persons with a legal or contractual right to such approval;

**6.6.1.3**    with such insurance coverage pertaining to liabilities arising out of the Remedial Work as is then customarily maintained with respect to such activities; and

**6.6.1.4**    only following receipt of any required permits, licenses or approvals.

**6.6.2**    The selection of the Remedial Work contractors and consulting environmental engineer, the contracts entered into with such parties, any disclosures to or agreements with any public or private agencies or parties relating to Remedial Work, and the written plan for the Remedial Work (and any changes thereto) shall each be subject to Lender's prior written approval, which shall not be unreasonably withheld or delayed.  In addition, Mortgagor shall submit to Lender, promptly upon receipt or preparation, copies of any and all reports, studies, analyses, correspondence, governmental comments or approvals, contracts and similar information prepared or received by Mortgagor in connection with any Remedial Work or Hazardous Material relating to the Site.

**6.7    Remedies on Default.**  A default by Mortgagor under any of the covenants, representations, or warranties set forth in this Article shall, upon the expiration of any applicable cure period, constitute an Event of Default entitling Lender to exercise all of the rights and remedies available to Lender; *provided, however,* that such Event of Default shall not form the basis for any claim for damages or indemnification hereunder by Lender against Mortgagor except to the extent of sums actually advanced by Lender pursuant to the terms of this Security Instrument as a consequence of such default prior to the date on which this Security Instrument is fully and finally foreclosed (judicially or non-judicially) or a conveyance in lieu thereof has become effective and has been recorded in the county where the Premises are located.

**6.8    Indemnification.**  Mortgagor shall hold harmless, indemnify, and defend Lender (with counsel selected by Lender in its sole discretion) from and against any and all claims, demands, damages (direct or indirect), losses, liens, liabilities, penalties, fines, lawsuits, and other proceedings and costs and expenses (including Legal Expenses) that result in actual cost and expense to Lender to maintain and protect Lender's security hereunder prior to the date on which this Security Instrument is fully and finally foreclosed (judicially or non-judicially) or a conveyance in lieu thereof has become effective and has been recorded in the county where the Premises are located, and arise directly or indirectly from or out of, or in any way are connected with:

**6.8.1**    the inaccuracy of the representations contained herein;

**6.8.2**    the discovery and/or clean-up of Hazardous Material existing on or in the Site at the time when Mortgagor first acquired ownership, or any clean-up, remediation, monitoring or other actions required as a result thereof;

**6.8.3**    any activities on the Site during Mortgagor's ownership, possession, or control of the Site that directly or indirectly result in the existence of Hazardous Material on or in

the Site or any Nearby Site in violation of any applicable Environmental Laws, or any clean-up, remediation, monitoring or other actions required as a result thereof; and

     **6.8.4**  any alleged or actual failure of any Improvements now or hereafter constructed on the Site to continuously comply with all Building Laws for any reason whatsoever, or any modification or correction of any of the Improvements so as to comply fully with Building Laws.

     **6.9**   **Scope.** The foregoing indemnification does not apply to any deposit or release of Hazardous Material on the Site caused solely by Lender, its agents, representatives, or employees (if acting in their capacities as agents, representatives or employees of Lender), or by any receiver for the Site or Property appointed at the request of Lender. Mortgagor acknowledges that, as between Mortgagor and Lender, Mortgagor will be solely responsible for all costs and expenses relating to the clean-up of Hazardous Material from the Site or from any Nearby Site or to the modification and correction of any of the Improvements to comply fully with all Building Laws.

## 7.    ACCELERATING TRANSFERS, DEFAULT AND REMEDIES.

     **7.1**   **Accelerating Transfers.**

     **7.1.1**  *"Accelerating Transfer"* means any Transfer not expressly permitted under the Loan Agreement.

     **7.1.2**  Mortgagor acknowledges that Lender is making one or more advances under the Loan Agreement in reliance on the expertise, skill and experience of Mortgagor; thus, the Secured Obligations include material elements similar in nature to a personal service contract. In consideration of Lender's reliance, Mortgagor agrees that Mortgagor shall not make any Accelerating Transfer without Lender's prior express written consent to the particular transaction and the transferee. Lender may withhold such consent in its sole discretion. If any Accelerating Transfer occurs, Lender, in its sole discretion, may declare all of the Secured Obligations to be immediately due and payable, and Lender may invoke any rights and remedies provided by this Security Instrument and any of the other Loan Documents.

     **7.2**   **Events of Default.** Mortgagor will be in default under this Security Instrument upon the occurrence of any one or more of the following events (each an *"Event of Default"* and some or all, collectively, *"Events of Default"*).

     **7.2.1**  Failure of Mortgagor to (a) make any payment required under this Security Instrument within ten (10) days after demand, if due on demand, or when otherwise due, or (b) perform or observe any agreement, covenant, or condition required under this Security Instrument within thirty (30) days after written notice from Lender to Mortgagor to do so.

     **7.2.2**  An "Event of Default" occurs under the Loan Agreement or any other Loan Document.

     **7.2.3**  Any default by Mortgagor under any Permitted Exception that is not cured within any applicable cure period therefor.

**7.2.4**   Any breach or default by Mortgagor under the Leases or under any material Contract that has continued beyond any applicable cure period therefor.

**7.3**   **Remedies.**

**7.3.1**   If an Event of Default has occurred and is continuing, Lender, at its option, may accelerate the maturity and declare the Secured Obligations to be immediately due and payable without further demand, and may either with or without entry or taking possession as herein provided or otherwise, proceed by suit or suits at law or in equity or any other appropriate proceeding or remedy   to enforce payment of the Mortgage Loan;   to foreclose this Security Instrument under ordinary or executory process;   to enforce or exercise any right under any Loan Document; and   to pursue any one (1) or more other remedies provided in this Security Instrument or in any other Loan Document or otherwise afforded by applicable law.   Lender may, in addition to or in lieu of the foregoing remedies, in Lender's sole discretion, commence an appropriate action against Mortgagor seeking specific performance of any covenant contained in this Security Instrument or in aid of the execution or enforcement of any power in this Security Instrument granted.   Each right and remedy provided in this Security Instrument or any other Loan Document is distinct from all other rights or remedies under this Security Instrument or any other Loan Document or otherwise afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.   In the event a foreclosure hereunder shall be commenced, Lender may at any time before the sale of the Property abandon the sale, and may then institute suit for the collection of all or any of the Secured Obligations, and for the foreclosure of this Security Instrument.   Election by Lender to pursue any remedy will not bar any other remedy, and an election to make expenditures or to take action to perform an obligation of Mortgagor under this Security Instrument, after Mortgagor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.   Nothing under this Security Instrument or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender during the continuance of an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Mortgagor and/or against any other co-maker, guarantor, surety or endorser of the Secured Obligations, and/or to proceed against any other collateral directly or indirectly securing the Secured Obligations.   Mortgagor has the right to bring an action to assert the nonexistence of an Event of Default or any other defense of Mortgagor to acceleration and sale.

**7.3.2**   In connection with any sale made under or by virtue of this Security Instrument, the whole of the Property may be sold in one (1) parcel as an entirety or in separate lots or parcels at the same or different times, all as Lender may determine in its sole discretion.   Lender shall have the right to become the purchaser at any sale held by public officer, and Lender purchasing at such sale shall have the right to credit upon the amount of the bid made therefor, to the extent necessary to satisfy such bid, the amount of the Secured Obligations owing to Lender. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, IF THE PROPERTY IS SOLD IN ACCORDANCE WITH THE TERMS OF THIS SECURITY INSTRUMENT FOR AN AMOUNT LESS THAN THE SECURED OBLIGATIONS OF MORTGAGOR TO LENDER, THE DEFICIENCY SHALL BE DETERMINED BY THE PURCHASE PRICE AT THE SALE. For purposes of foreclosure under the Louisiana executory process procedures, Mortgagor confesses judgment and acknowledges to be indebted to and in favor of Lender up to the full amount of the Secured Obligations, including principal, interest, prepayment premiums, late charges,

default interest, costs, expenses, collection attorneys' fees, and any additional sums that Lender may advance as provided under this Security Instrument.

       **7.3.2.1**    To the extent permitted under applicable Louisiana law, Mortgagor additionally waives:

         (A)    the benefit of appraisal as provided in Articles 2332, 2336, 2723 and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sale;

         (B)    the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure;

         (C)    the three (3) days delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and

         (D)    all other benefits provided under Articles 2331, 2722 and 2723 of the Louisiana Code of Civil Procedure and all other articles not specifically mentioned above.

       **7.3.2.2**    To the extent permitted under applicable Louisiana law, Mortgagor agrees that Lender shall have all of the additional enforcement rights and remedies of a secured party under the Louisiana Commercial Laws (Louisiana Revised Statutes, Title 10) and under the Uniform Commercial Code of any applicable state with respect to the UCC Collateral wherever located.

       **7.3.3**    Mortgagor acknowledges and agrees that the proceeds of any sale shall be applied as determined by Lender unless otherwise required by applicable law.  Mortgagor further agrees that any declarations of fact made under an authentic act before a Notary Public in the presence of two witnesses, by a person declaring such facts to lie within his or her knowledge, shall constitute authentic evidence for purposes of executory process and also for purposes of Louisiana Revised Statutes, Title 9, Sections 3509.1, 3504(D)(6), and 5555, and Title 10, Section 9-629, where applicable.

       **7.3.4**    In connection with the exercise of Lender's rights and remedies under this Security Instrument and any other Loan Document, there shall be allowed and included as Secured Obligations:  all expenditures and expenses authorized by applicable law and all other expenditures and expenses which may be paid or incurred by or on behalf of Lender for reasonable legal fees, appraisal fees, outlays for documentary and expert evidence, stenographic charges and publication costs;  all expenses of any environmental site assessments, environmental audits, environmental remediation costs, appraisals, surveys, engineering studies, wetlands delineations, flood plain studies, and any other similar testing or investigation deemed necessary or advisable by Lender incurred in preparation for, contemplation of or in connection with the exercise of Lender's rights and remedies under the Loan Documents; and  costs (which may be reasonably estimated as to items to be expended in connection with the exercise of Lender's rights and remedies under the Loan Documents) of procuring all abstracts of title, title searches and examinations, title insurance policies, and similar data and assurance with respect to title as Lender may deem reasonably necessary either to prosecute any suit or to evidence the true conditions of the title to or the value

of the Property to bidders at any sale which may be held in connection with the exercise of Lender's rights and remedies under the Loan Documents. All expenditures and expenses of the nature mentioned in this Section 7.3, and such other expenses and fees as may be incurred in the protection of the Property and rents and income therefrom and the maintenance of the lien of this Security Instrument, including the fees of any attorney employed by Lender in any litigation or proceedings affecting this Security Instrument, the Note, the other Loan Documents, or the Property, including bankruptcy proceedings, any Foreclosure Event, or in preparation of the commencement or defense of any proceedings or threatened suit or proceeding, or otherwise in dealing specifically therewith, shall be so much additional Secured Obligations and shall be immediately due and payable by Mortgagor, with interest thereon at the Default Rate until paid.

7.3.5    Any action taken by Lender pursuant to the provisions of this Section 7.3 shall comply with the laws of the Property Jurisdiction. Such applicable laws shall take precedence over the provisions of this Section 7.3, but shall not invalidate or render unenforceable any other provision of any Loan Document that can be construed in a manner consistent with any applicable law. If any provision of this Security Instrument shall grant to Lender (including Lender acting as a mortgagee-in-possession), or a keeper appointed pursuant to the provisions of this Security Instrument any powers, rights or remedies prior to, upon, during the continuance of or following an Event of Default that are more limited than the powers, rights, or remedies that would otherwise be vested in such party under any applicable law in the absence of said provision, such party shall be vested with the powers, rights, and remedies granted in such applicable law to the full extent permitted by law. If any law referred to in this Security Instrument and now in force, of which Mortgagor or Mortgagor's successors and assigns and such other persons claiming any interest in the Property might take advantage despite this Security Instrument shall hereafter be repealed or cease to be in force, such law shall not thereafter be deemed to preclude the application of this Section 7.3.

7.4    **Waiver of Statute of Limitations and Marshaling.** Mortgagor hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any Loan Document. Notwithstanding the existence of any other security interests in the Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Property shall be subjected to the remedies provided in this Security Instrument and/or any other Loan Document or by applicable law. Lender shall have the right to determine the order in which any or all portions of the Secured Obligations are satisfied from the proceeds realized upon the exercise of such remedies. Mortgagor, for itself and all who may claim by, through or under it, and any party who now or in the future acquires a security interest in the Property and who has actual or constructive notice of this Security Instrument, waives any and all right to require the marshaling of assets or to require that any of the Property be sold in the inverse order of alienation or that any of the Property be sold in parcels (at the same time or different times) in connection with the exercise of any of the remedies provided in this Security Instrument or any other Loan Document, or afforded by applicable law.

7.5    **Waiver of Redemption; Rights of Tenants.** Mortgagor hereby covenants and agrees that it will not at any time apply for, insist upon, plead, avail itself, or in any manner claim or take any advantage of, any appraisement, stay, exemption or extension law or any so-called "Moratorium Law" now or at any time hereafter enacted or in force in order to prevent or hinder the enforcement or foreclosure of this Security Instrument. Without limiting the foregoing:

7.5.1    Mortgagor, for itself and all Persons who may claim by, through or under Mortgagor, hereby expressly waives any so-called "Moratorium Law" and any and all rights of reinstatement and redemption, if any, under any order or decree of foreclosure of this Security Instrument, it being the intent hereof that any and all such "Moratorium Laws", and all rights of reinstatement and redemption of Mortgagor and of all other Persons claiming by, through or under Mortgagor are and shall be deemed to be hereby waived to the fullest extent permitted by the laws of the Property Jurisdiction;

7.5.2    Mortgagor shall not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any right, power or remedy herein or otherwise granted or delegated to Lender but will suffer and permit the execution of every such right, power and remedy as though no such law or laws had been made or enacted; and

7.5.3    if Mortgagor is a trust, Mortgagor represents that the provisions of this Section 7.5 (including the waiver of reinstatement and redemption rights) were made at the express direction of Mortgagor's beneficiaries and the persons having the power of direction over Mortgagor, and are made on behalf of the trust estate of Mortgagor and all beneficiaries of Mortgagor, as well as all other persons mentioned above.

7.5.4    Lender shall have the right to foreclose subject to the rights of any tenant or tenants of the Property having an interest in the Property prior to that of Lender. The failure to join any such tenant or tenants of the Property as party defendant or defendants in any such civil action or the failure of any decree of foreclosure and sale to foreclose their rights shall not be asserted by Mortgagor as a defense in any civil action instituted to collect the Secured Obligations, or any part thereof or any deficiency remaining unpaid after foreclosure and sale of the Property, any statute or rule of law at any time existing to the contrary notwithstanding.

## 8.    MISCELLANEOUS PROVISIONS.

8.1    **Additional Provisions.**  The Loan Documents fully state all of the terms and conditions of the parties' agreement regarding the matters mentioned in or incidental to this Security Instrument. The Loan Documents also grant further rights to Lender and contain further agreements and affirmative and negative covenants by Mortgagor that apply to this Security Instrument and to the Property.

8.2    **No Waiver or Cure.**

8.2.1    Each waiver by Lender must be in writing, and no waiver shall be construed as a continuing waiver. No waiver shall be implied from any delay or failure by Lender to take action on account of any default of Mortgagor. Consent by Lender to any act or omission by Mortgagor shall not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Lender's consent to be obtained in any future or other instance.

8.2.2    If any of the events described below occurs, that event alone shall not: cure or waive any breach, Event of Default or notice of default under this Security Instrument or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Loan Documents have been cured); or impair the security of this

Security Instrument; or prejudice Lender or any receiver in the exercise of any right or remedy afforded any of them under this Security Instrument; or be construed as an affirmation by Lender of any tenancy, lease or option, or a subordination of the lien of this Security Instrument.

      **8.2.2.1**    Lender, its agent or a receiver takes possession of all or any part of the Property in the manner provided herein.

      **8.2.2.2**    Automatic termination of the License to collect Rents and administer the Leases.

      **8.2.2.3**    Lender exercises any of its rights under the assignment of Leases and Rents or collects and applies Rents as permitted hereunder, either with or without taking possession of all or any part of the Property or assuming any of the Leases.

      **8.2.2.4**    Lender exercises any of its rights under the assignment of Contracts provided for herein or collects and applies any amounts due under the Contracts, either with or without taking possession of all or any part of the Property or assuming any of the Contracts.

      **8.2.2.5**    Lender takes any action to preserve its security hereunder or cure any default of Mortgagor under the Leases or Contracts.

      **8.2.2.6**    Lender receives and applies to any Secured Obligation any proceeds of any Property, including any proceeds of insurance policies, condemnation awards, or other claims, property or rights assigned to Lender under this Security Instrument.

      **8.2.2.7**    Lender makes a site visit, observes the Property and/or conducts tests as permitted under the Loan Documents.

      **8.2.2.8**    Lender receives any sums under this Security Instrument or any proceeds of any collateral held for any of the Secured Obligations, and applies them to one or more Secured Obligations.

      **8.2.2.9**    Lender or any receiver invokes any right or remedy provided under this Security Instrument.

**8.3**    **Powers of Lender.**

      **8.3.1**    If Lender performs any act that it is empowered or authorized to perform under this Security Instrument, that act alone shall not release or change the personal liability of any person for the payment and performance of the Secured Obligations then outstanding, or the lien of this Security Instrument on all or the remainder of the Property for full payment and performance of all outstanding Secured Obligations. The liability of the original Mortgagor shall not be released or changed if Lender grants any successor in interest to Mortgagor any extension of time for payment, or modification of the terms of payment, of any Secured Obligation. Lender shall not be required to comply with any demand by the original Mortgagor that Lender refuse to grant such an extension or modification to, or commence proceedings against, any such successor in interest.

**8.3.2** Lender may take any of the actions permitted under this Security Instrument regardless of the adequacy of the security for the Secured Obligations, or whether any or all of the Secured Obligations have been declared to be immediately due and payable, or whether notice of default and election to sell has been given under this Security Instrument.

**8.3.3** From time to time, Lender may apply to any court of competent jurisdiction for aid and direction in executing and enforcing the rights and remedies created under this Security Instrument. Lender may from time to time obtain orders or decrees directing, confirming or approving acts in executing and enforcing these rights and remedies.

**8.4    Assignment.** All rights of Lender hereunder shall inure to the benefit of its successors and assigns, and all obligations of Mortgagor shall bind its successors and assigns and any subsequent owner of the Property. All rights of Lender in, to and under this Security Instrument shall pass to and may be exercised by any assignee of such rights of Lender. Mortgagor hereby agrees that if Lender gives notice to Mortgagor of an assignment of said rights, upon such notice, the liability of Mortgagor to the assignee of Lender shall be immediate and absolute. Mortgagor will not set up any claim against Lender or any intervening assignee as a defense, counterclaim, or setoff to any action brought by Lender or any intervening assignee for any amounts due hereunder or for possession of or the exercise of rights with respect to the Leases, Rents, or Contracts.

**8.5    No Offset.** Mortgagor's obligation to timely pay and perform all obligations under the Note, this Security Instrument, and the other Loan Documents shall be absolute and unconditional and shall not be affected by any event or circumstance, including any setoff, counterclaim, abatement, suspension, recoupment, deduction, defense or any other right that Mortgagor or any guarantor may have or claim against Lender or any other person or entity. The foregoing shall not constitute a waiver of any claim or demand which Mortgagor or any guarantor may have in damages or otherwise against Lender or any other person or entity if Mortgagor maintains a separate action thereon.

**8.6    Imposition of Mortgage Tax.** Mortgagor shall pay the cost of any Mortgage Tax due in connection with this Security Instrument or the Secured Obligations secured hereby. For purposes of this Section, *"Mortgage Tax"* means: (a) a specific tax on mortgages or other security instruments or on all or any part of the Secured Obligations secured by a mortgage or other security instrument; or (b) a specific tax on the owner of the Property covered by a mortgage or security instrument which the taxpayer is authorized or required to deduct from payments on debt secured by the mortgage or security instrument; or (c) a tax on property covered by a mortgage or security instrument chargeable against a lender, beneficiary or trustee or the holder of the note secured by the security instrument; or (d) a specific tax (other than an income tax or a gross receipts tax) on all or any portion of the Secured Obligations or on payments of principal and interest made by a grantor under a security instrument. If any Mortgage Tax is enacted subsequent to the date of this Security Instrument, enactment of the Mortgage Tax shall constitute an Event of Default, and Lender may exercise any or all of the remedies available to it upon the occurrence of any Event of Default, unless the following conditions are met: (i) Mortgagor can lawfully pay the Mortgage Tax without causing any resulting economic disadvantage or increase of tax to Lender; and (ii) Mortgagor pays the Mortgage Tax (including any tax on the payment made) within thirty (30) days after notice from Lender that the tax law has been enacted.

**8.7    Merger.**  No merger shall occur as a result of Lender's acquiring any other estate in or any other lien on the Property unless Lender consents to a merger in writing.

**8.8    Joint and Several Liability.**  If Mortgagor consists of more than one person, each shall be jointly and severally liable for the faithful performance of all of Mortgagor's obligations under this Security Instrument.

**8.9    Successors in Interest.**  The terms, covenants and conditions of this Security Instrument shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties.  However, this Section does not waive any prohibitions on assignment or transfer of the Property provided herein or in any of the other Loan Documents.

**8.10    Interpretation.**

**8.10.1**  Whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender.  The captions of the sections of this Security Instrument are for convenience only and do not define or limit any terms or provisions.

**8.10.2**  The word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to."

**8.10.3**  The word "or" has the inclusive meaning represented by the phrase "and/or."

**8.10.4**  No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Security Instrument.  The Exhibits to this Security Instrument are hereby incorporated in this Security Instrument.

**8.11    In-House Counsel Fees.**  Whenever Mortgagor is obligated to pay or reimburse Lender for any attorneys' fees, those fees shall include the allocated costs for services of in-house counsel.

**8.12    Waiver of Statutory Rights.**  To the fullest extent not prohibited by Law:

**8.12.1**  Mortgagor hereby agrees that it will not apply for or avail itself of any appraisement, valuation, stay, extension or exemption Laws, or any so-called "Moratorium Laws," now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Security Instrument, but hereby waives the benefit of such Laws.

**8.12.2**  Mortgagor for itself and all who may claim through or under it waives any and all right to have the property and estates comprising the Property marshaled upon any foreclosure of the lien hereof and agrees that any court having jurisdiction to foreclose such lien may order the Property sold as an entirety.

**8.12.3**  Mortgagor hereby waives any and all rights of redemption from sale under any judgment of foreclosure of this Security Instrument on behalf of Mortgagor and on behalf of each and every person acquiring any interest in or title to the Property of any nature whatsoever,

subsequent to the date of this Security Instrument, and agrees to take any and all further actions as may be necessary to waive the right of redemption.

      **8.12.4**  Mortgagor hereby waives any defense of laches and all statutes of limitation with respect to enforcement of this Security Instrument.

      **8.13**  **Severability.**  If any provision of this Security Instrument is held unenforceable or void, that provision shall be deemed severable from the remaining provisions and shall in no way affect the validity of this Security Instrument except that if such provision relates to the payment of any monetary sum or has a material adverse effect on Lender's security for the Secured Obligations, then Lender may, at its option, declare all Secured Obligations immediately due and payable.

      **8.14**  **Notices.**  Any notice, demand, request or other communication that any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given when made as provided in the Loan Agreement.

      **8.15**  **Lender's Lien for Service Charge and Expenses.**  At all times, regardless of whether any Loan proceeds have been disbursed, this Security Instrument secures (in addition to any Loan proceeds disbursed from time to time) the payment of any and all loan commissions, service charges, liquidated damages, expenses and advances due to or incurred by Lender not to exceed the maximum amount secured hereby.

      **8.16**  **WAIVER OF TRIAL BY JURY.**  MORTGAGOR AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THAT THEY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING IN ANY WAY IN CONNECTION WITH THIS SECURITY INSTRUMENT, THE NOTE, OR ANY OF THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY OTHER STATEMENTS OR ACTIONS OF MORTGAGOR OR LENDER. MORTGAGOR ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS SECURITY INSTRUMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS DISCUSSED THIS WAIVER WITH SUCH LEGAL COUNSEL. MORTGAGOR FURTHER ACKNOWLEDGES THAT (i) IT HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER, (ii) THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO MAKE THE LOAN, ENTER INTO THIS SECURITY INSTRUMENT AND EACH OF THE OTHER LOAN DOCUMENTS, AND (iii) THIS WAIVER SHALL BE EFFECTIVE AS TO EACH OF SUCH OTHER LOAN DOCUMENTS AS IF FULLY INCORPORATED THEREIN.

      **8.17**  **Inconsistencies.**  In the event of any inconsistency between this Security Instrument and the Loan Agreement, the terms hereof shall be controlling to the extent necessary to create, preserve, and/or maintain a valid security interest upon the Property; otherwise the provisions of the Loan Agreement shall be controlling.

      **8.18**  **Applicable Law.**  The creation, perfection, and enforcement of the lien of this Security Instrument shall be governed by the Laws of the state in which the Premises are located. In all other respects, this Security Instrument shall be governed by the substantive Laws of the jurisdiction governing the Loan Agreement.

**8.19**   **Louisiana State-Specific Provisions.**  The following state-specific terms and conditions shall control over any inconsistent provisions of this Security Instrument:

    **8.19.1**   If Lender is a savings and loan association, the Note and the other amounts secured by this Security Instrument shall be secured by a vendor's lien and privilege on and against the Property pursuant to the provisions of Louisiana Revised Statutes, Title 6, Section 830.

    **8.19.2**   The production of mortgage and conveyance certificates is waived by Lender and Mortgagor, who release me, Notary, and any insurer from all liability for nonproduction thereof.

    **8.19.3**   Pursuant to the provisions of Louisiana Revised Statutes, Title 9, Sections 5136-9:5140.2, as the same may hereafter be amended, Mortgagor and Lender covenant and agree that Lender shall have the right to designate a keeper of the Property at the time any seizure of the Property is effected and that Lender may designate itself or its employees, agents or independent contractors as such keeper.  Mortgagor agrees that the reasonable fees of such a keeper shall be treated as a disbursement made under this Security Instrument and shall be secured by this Security Instrument.  At no time has or will Mortgagor occupy the Property, or any portion of the Property, as its home.

    **8.19.4**   Mortgagor acknowledges that no promissory note or other instrument evidencing any part of the Secured Obligations has been presented to the undersigned Notary Public to be paraphed for identification herewith.

**8.20**   **Counterparts.**  This Security Instrument may be executed in any number of counterparts and by different signatories hereto in separate counterparts, each of which when so executed shall be deemed to be an original but all of which taken together shall constitute one and the same instrument with the same effect as if all signatories hereto had signed the same signature page.  Any signature page of this Security Instrument may be detached from any counterpart of this Security Instrument without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Security Instrument identical in form hereto but having attached to it one or more additional signature pages.

**8.21**   **Notice of Indemnification.**  MORTGAGOR HEREBY ACKNOWLEDGES AND AGREES THAT THIS SECURITY INSTRUMENT CONTAINS CERTAIN INDEMNIFICATION PROVISIONS WHICH, IN CERTAIN CIRCUMSTANCES, COULD INCLUDE AN INDEMNIFICATION BY MORTGAGOR OF LENDER FROM CLAIMS OR LOSSES ARISING AS A RESULT OF LENDER'S OWN NEGLIGENCE.

**8.22**   **Release.** Upon payment of the Secured Obligations in full, Mortgagor may request Lender in writing to provide Mortgagor a mortgage release in authentic form together with a request to cancel that comply with the provisions of La. Rev. Stat. 9:5169 or 9:5172, as applicable, sufficient to permit Mortgagor to cancel this Security Instrument from the mortgage records. Mortgagor waives the right to terminate this Security Instrument upon reasonable notice to Lender as provided by Louisiana Civil Code Article 3298D.  If Mortgagor requests Lender to perform the necessary services to cancel this Security Instrument from the public records, Mortgagor agrees to pay Lender's reasonable costs incurred in connection with such cancellation.

8.23    **Incorporation of Exhibits and Riders.**  The following Exhibits and Riders attached to this Security Instrument are incorporated herein and expressly made a part hereof by this reference:

8.23.1  Exhibit A – Legal Description

8.23.2  **Reserved.**

8.23.3  **Reserved.**

8.23.4  **Reserved.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURES
APPEAR ON THE FOLLOWING PAGE]**

MORTGAGOR/GRANTOR:

LAKEWOOD POINTE APTS LLC, a Delaware limited
liability company

By:
Name: Fredrick Schulman
Its: Authorized Signatory


State of NEW YORK

County of ROCKLAND

On the 20th day of July in the year 2021 before me personally came Fredrick Schulman to
me known, who, being by me duly sworn, did depose and say that he/she/they reside(s) in
15 Longhill Rd E, Botsworth NY (if the place of residence is in a city, include the street
and street number, if any, thereof); that he/she/they is (are) the Authorized Signatory of
Lakewood Pointe Apts LLC, a Delaware limited liability company, the limited liability
company described in and which executed the above instrument; and that he/she/they
signed his/her/their name(s) thereto by authority of the board of directors of said
corporation.

Notary Public

Printed Name: Natalie Sanchez

My Commission Expires:

April 5, 2023

NATALIE SANCHEZ
Notary Public - State of New York
No. 01SA6022545
Qualified in Rockland County
My Comm. Expires Apr. 5, 2023

**EXHIBIT A**

**DESCRIPTION OF PREMISES**

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of New Orleans, Parish of Orleans, State of Louisiana.

That Certain Piece of ground, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the Third Municipal District of the City of New Orleans, Parish of Orleans, State of Louisiana, in Section 20 of the LaKratt Tract (formerly New Orleans Lakeshore Land Co. Subdivision), designated as LOT 2A on a survey by the Office of Gandolfo, Kuhn & Associates, dated December 3, 1971, (H-70-2) and more particularly as follow in accordance with said survey:

Begin at the intersection of the west line of St. Charles Canal and the new south line of Morrison Road; thence along the west line of St. Charles Canal S 21°28'50" E distance of 1381.15 feet to the north line of Interstate Highway I-10; thence along said north line, S 78°01'13" W a distance of 230.57 feet to a point of curvature; thence continuing along said north line in a southwesterly direction along a curve to the right having a radius of 3669.72 feet, a distance of 944.29 feet to the east line of Joffre Road; thence along said east line, N 03°15'48" E a distance of 59.86 feet to a point of curvature; thence along said east line in a northwesterly direction along a curve to the left having radius of 491.27 feet, a distance of 213.42 feet to a point of tangent; thence along said east line, N 21°37'36" W, a distance of 803.66 feet to the new south line of Morrison Road; thence along said south line, which is 20 feet south of and parallel to the former south line of Morrison Road, N 68°15'24" E, a distance of 1060.48 feet to the west line of St. Charles Canal the point of beginning.

Said portion of ground consists of Portions of Groves 1, 3, 5, 7, 9, 11, 13, 15 & 17 of Section 20 of the former New Orleans Lakeshore Land Company Tract.

## SCHEDULE 1

## MORTGAGOR RESOLUTIONS

CERTIFICATE OF CONSENT TO
PURCHASE MEMBERSHIP INTERESTS AND ENTER LOAN

The undersigned, the manager and authorized signatory of (i) NBA New Orleans Holdings LLC; (ii) Bergenfield Investors LLC; (iii) Stonebridge Partner LLC; (iv) RAYLBNT LLC; (v) Crown Capital Holdings LLC; and (vi) PAR Manager I LLC (collectively, the "Purchaser") does hereby adopt the following resolutions on behalf of the Purchaser:

WHEREAS, the Purchaser is purchasing the membership interests ("Interests") in Lakewood Pointe Apts LLC (the "Company") and Company is the fee owner of real property known as Laguna Run Apartments located at 7001 Martin Drive, New Orleans, Louisiana 70126 (the "Property"); and

WHEREAS, the Company will receive a loan in an amount not to exceed $22,400,000.00 ("Loan") from KeyBank National Association ("Lender") and in connection therewith enter into loan documents ("Loan Documents").

NOW, THEREFORE, BE IT RESOLVED:  That the Purchaser hereby ratifies and approves that certain Purchase and Sale of Company Interests Agreement and Joint Escrow Instructions, dated October 2, 2020 (as assigned and/or amended, the "Contract") by and between RH East Lake LLC, a Delaware limited liability company, as seller, and Purchaser, as purchaser, for the purchase of the Interests of Company and as a result thereof, ownership of the Property;

FURTHER RESOLVED:  That the Purchaser be, and it hereby is, authorized and empowered to purchase the Interests pursuant to the Contract (the "Purchase") and take such action as is necessary or advisable in furtherance of same, including, but not limited to the execution and delivery of any and all documents and instruments in order to effectuate the Purchaser transaction;

FURTHER RESOLVED:  That the Company be, and it hereby is, authorized and empowered to receive the Loan from Lender and take such action as is necessary or advisable in furtherance of same, including, but not limited to the execution and delivery of the Loan Documents any and all other documents and instruments in order to effectuate the Loan transaction;

FURTHER RESOLVED: Fredrick Schulman, as an authorized signatory (the "Authorized Signatory"), acting singly as an authorized signatory, is duly authorized to execute and deliver on behalf of the Purchaser and the Company all documents in connection with the Purchase transaction and the Loan transaction as he deems necessary or desirable to effectuate such transactions, all upon such terms and conditions as he shall approve, with his execution thereof constituting conclusive evidence of such approval;

FURTHER RESOLVED: That this Consent may be executed by facsimile, PDF or other electronic signatures and in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Consent.

[REMAINDER OF PAGE BLANK – SIGNATURES FOLLOW]

IN WITNESS WHEREOF, the undersigned have executed this Consent, as of July 28, 2021.

NBA NEW ORLEANS HOLDINGS LLC

By: _____
Name: Fredrick Schulman
Title: Managing Member

By: _____
Name: Mark Silber (a/k/a Moshe Silber)
Title: Managing Member

BERGENFEILD INVESTORS LLC

By: _____
Name: Fredrick Schulman
Title: Authorized Signatory

STONEBRIDGE PARTNER LLC

By: _____
Name: Fredrick Schulman
Title: Authorized Signatory

RAYLBNT LLC

By: _____
Name: Fredrick Schulman
Title: Authorized Signatory

CROWN CAPITAL HOLDINGS LLC

By: _____
Name: Fredrick Schulman
Title: Authorized Signatory

PAR MANAGER I LLC

By: _____

Name: Fredrick Schulman
Title: Authorized Signatory

---

*Security Instrument*
*Third Party Grantor Rider-- page 6*



1340 Poydras Street, 4th Floor
New Orleans, Louisiana 70112

Land Records Division
Telephone (504) 407-0005

# Chelsey Richard Napoleon
### Clerk of Court and Ex-Officio Recorder
Parish of Orleans

## DOCUMENT RECORDATION INFORMATION

Instrument Number: 2021-38637

Recording Date: 9/21/2021 08:00:00 AM

Document Type: MORTGAGE

Addtl Titles Doc Types:

Mortgage Instrument Number: 1370575

Filed by: MADISON TITLE AGENCY
1125 OCEAN AVENUE

LAKEWOOD, NJ 08701

## THIS PAGE IS RECORDED AS PART OF YOUR DOCUMENT AND SHOULD BE RETAINED WITH ANY COPIES.

Sybil Thomas, Deputy Clerk
A True and Correct Copy
Chelsey Richard Napoleon, Clerk, Civil District Court



Chelsey Richard Napoleon
CLERK OF CIVIL DISTRICT COURT
INST #: 2021-38638 09/21/2021 08:00:01 AM
TYPE: UCC1ECFF 7 PG(S)
ADDTL TITLES: 1 UCC#: 36-2021-38638

Record and return to:
Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701
MTA 154876.03

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

UCC1ECFF
NSF 90
(5) AT 15
10
65

plus RE
235



EXHIBIT
6

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
JAMES J. SCHWERT, ESQ. (612) 607-7308

**B. E-MAIL CONTACT AT FILER (optional)**
JSCHWERT@FOXROTHCHILD.COM

**C. EMAIL ACKNOWLEDGMENT TO:** (Email Address)

JAMES J. SCHWERT, ESQ.
FOX ROTHSCHILD LLP
222 SOUTH NINTH STREET, SUITE 2000
MINNEAPOLIS, MN 55402-3338

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| LAKEWOOD POINTE APTS LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7001 MARTIN ROAD | NEW ORLEANS | LA | 70126 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| KEYBANK NATIONAL ASSOCIATION | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 66 S. PEARL STREET, 7TH FLOOR | ALBANY | NY | 12207 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:

SEE EXHIBIT A ATTACHED HERETO FOR A DESCRIPTION OF THE REAL ESTATE TO WHICH CERTAIN OF THE COLLATERAL RELATES.

SEE EXHIBIT B ATTACHED HERETO FOR A DESCRIPTION OF THE COLLATERAL. CERTAIN OF THE GOODS DESCRIBED IN EXHIBIT B ARE, OR ARE TO BECOME, FIXTURES ON THE REAL ESTATE DESCRIBED IN EXHIBIT A, AND THIS FINANCING STATEMENT IS TO BE FILED FOR RECORD IN THE REAL ESTATE RECORDS.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Laguna Run Apartments (203807.575) Orleans Parish, Louisiana

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)
Rev. 4/21/16

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**LAKEWOOD POINTE APTS LLC**

OR
9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR
10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☑ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

**SEE EXHIBIT A ATTACHED HERETO**

17. MISCELLANEOUS:

NAME OF FIRST DEBTOR (1A OR 1B) ON RELATED FINANCING STATEMENT

| ORGANIZATION'S NAME | | | |
|---|---|---|---|
| LAKEWOOD POINTE APTS LLC | | | |
| INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

NAME OF FIRST SECURED PARTY (3A OR 3B) ON RELATED FINANCING STATEMENT

| ORGANIZATION'S NAME | | |
|---|---|---|
| KEYBANK NATIONAL ASSOCIATION | | |
| INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
| | | |

## EXHIBIT A TO UCC FINANCING STATEMENT

### Legal Description

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of New Orleans, Parish of Orleans, State of Louisiana.

That Certain Piece of ground, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the Third Municipal District of the City of New Orleans, Parish of Orleans, State of Louisiana, in Section 20 of the LaKratt Tract (formerly New Orleans Lakeshore Land Co. Subdivision), designated as LOT 2A on a survey by the Office of Gandolfo, Kuhn & Associates, dated December 3, 1971, (H-70-2) and more particularly as follow in accordance with said survey:

Begin at the intersection of the west line of St. Charles Canal and the new south line of Morrison Road; thence along the west line of St. Charles Canal S 21°28'50" E distance of 1381.15 feet to the north line of Interstate Highway I-10; thence along said north line, S 78°01'13" W a distance of 230.57 feet to a point of curvature; thence continuing along said north line in a southwesterly direction along a curve to the right having a radius of 3669.72 feet, a distance of 944.29 feet to the east line of Joffre Road; thence along said east line, N 03°15'48" E a distance of 59.86 feet to a point of curvature; thence along said east line in a northwesterly direction along a curve to the left having radius of 491.27 feet, a distance of 213.42 feet to a point of tangent; thence along said east line, N 21°37'36" W, a distance of 803.66 feet to the new south line of Morrison Road; thence along said south line, which is 20 feet south of and parallel to the former south line of Morrison Road, N 68°15'24" E, a distance of 1060.48 feet to the west line of St. Charles Canal the point of beginning.

Said portion of ground consists of Portions of Groves 1, 3, 5, 7, 9, 11, 13, 15 & 17 of Section 20 of the former New Orleans Lakeshore Land Company Tract.

NOTE FOR INFORMATION: Being Parcel No. 3-9W-0-159-05, of the City of New Orleans, Parish of Orleans

NAME OF FIRST DEBTOR (1A OR 1B) ON RELATED FINANCING STATEMENT

| ORGANIZATION'S NAME | | | |
|---|---|---|---|
| LAKEWOOD POINTE APTS LLC | | | |
| INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

NAME OF FIRST SECURED PARTY (3A OR 3B) ON RELATED FINANCING STATEMENT

| ORGANIZATION'S NAME | | |
|---|---|---|
| KEYBANK NATIONAL ASSOCIATION | | |
| INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

## EXHIBIT B TO UCC FINANCING STATEMENT

All of the following described property and interests in property, whether now owned or existing or hereafter acquired, arising or created:

(a)    All buildings, structures, and improvements now located or later to be constructed (collectively "**Improvements**") on the real property described in Exhibit "A" attached hereto (the "**Premises**"; with the Premises and Improvements collectively referred to herein as "**Project**");

(b)    All existing and future appurtenances, privileges, easements, franchises, and tenements of the Premises, including all minerals, oil, gas, other hydrocarbons and associated substances, sulfur, nitrogen, carbon dioxide, helium, and other commercially valuable substances that may be in, under or produced from any part of the Premises, all development rights and credits, air rights, water, water rights (whether riparian, appropriative or otherwise, and whether or not appurtenant), and water stock, and any portion of the Premises lying in the streets, roads or avenues currently existing or later constructed;

(c)    All existing and future leases, subleases, subtenancies, licenses, rental agreements, occupancy agreements, and concessions relating to the use and enjoyment of or affecting all or any part of the Premises or Improvements, any and all guaranties, extensions, renewals, replacements and modifications thereof, and all other agreements relating to or made in connection therewith, and any agreement (written or oral) between Debtor or its agents, and any tenant, lessee, occupant, licensee, guest or invitee pursuant to which Debtor, or its agent, agrees to permit such tenant, lessee, occupant, licensee, guest or invitee to park in or at the Project (each a "**Lease**", and collectively, the "**Leases**");

(d)    All appurtenances and other property and interests of any kind or character, that may be reasonably necessary or desirable to promote the present and any reasonable future beneficial use and enjoyment of the Premises or Improvements;

(e)    All goods, materials, supplies, chattels, furniture, fixtures, equipment, and machinery now or later to be attached to, placed in or on, or used in connection with the use, enjoyment, occupancy or operation of all or any part of the Premises or Improvements, whether stored on the Premises or elsewhere, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning,

lighting, refrigeration, and plumbing fixtures and equipment, and any manufacturer's warranties with respect thereto;

(f)     All building materials, equipment, work in process and other personal property of any kind, whether stored on the Premises or elsewhere, that have been or later will be acquired for the purpose of being delivered to, incorporated into or installed in or about the Premises or Improvements;

(g)     All of Debtor's interest in and to all operating accounts, all funds to be disbursed by Secured Party to Debtor, whether disbursed or not; all reserve accounts, impound accounts, and any other bank accounts of Debtor relating to the Project or the operation thereof;

(h)     All rights to the payment of money, accounts, accounts receivable, reserves, deferred payments, refunds, cost savings, payments and deposits, whether now or later to be received from third parties (including all earnest money sales deposits) or deposited by Debtor with third parties (including all utility deposits), chattel paper, instruments, documents, notes, drafts and letters of credit (other than letters of credit in favor of Secured Party), that arise from or relate to construction on the Premises or to any business now or later to be conducted on it, or to the Premises and Improvements generally;

(i)     All insurance policies and the proceeds thereof pertaining to the Premises, the Improvements, or any other property described in this Exhibit A, and all proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any property described in this Exhibit A into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding or any settlement in lieu thereof, and all causes of action and their proceeds for any damage or injury to the Premises, Improvements or the other property described in this Exhibit A, or breach of warranty in connection with the construction of the Improvements, including causes of action arising in tort, contract, fraud or concealment of a material fact;

(j)     All of Debtor's right, title, and interest in and to any and all units, common elements, declarant rights, development rights, and any other rights relating to the Premises or the Improvements, whether now existing or subsequently arising, under any and all condominium declarations, covenants, conditions, and restrictions, development agreements, or other agreements or declarations now existing or later executed relating to the Premises or Improvements, and all laws now existing or later enacted relating to the Premises or Improvements, including those relating to condominiums, and all rights of Debtor in connection with any owner's association, condominium association, architectural control committee, or similar association or committee, established in connection with the Project, including Debtor's rights and powers to elect, appoint, and remove officers and directors of any such associations or committees;

(k)     All of Debtor's right, title, and interest in and to any swap transaction or interest rate agreement or interest rate hedging program through the purchase by Debtor of an

interest rate swap, cap, or such other interest rate protection product (an agreement evidencing any such arrangement, an **"Interest Rate Agreement"***)*, all whether now or hereafter entered into by Debtor, including any and all amounts payable to Debtor, any deposit account or accounts with Secured Party in the name of Debtor for deposit of payments to Debtor in connection with any Interest Rate Agreement or swap transaction, and any and all funds now or hereafter on deposit therein;

(l)     All of Debtor's right, title, and interest in and to (i) all agreements (except for Leases), commitments, and options now or hereafter existing with respect to the construction, ownership, maintenance, operation, management, or use of the Premises or Improvements, including the Management Agreement between RH East Lake LLC and The Lynd Company dated September 16, 2019 and assigned to Debtor by Assignment and Assumption of Property Management Agreement dated July 28, 2021 executed and delivered by RH East Lake LLC to Debtor; (ii) all plans, specifications, drawings, and reports now existing or hereafter prepared with respect to the Premises or Improvements, including architectural and engineering plans, specifications and drawings, soils reports, environmental reports, and all other property reports; (iii) the Project Licenses (hereinafter defined); (iv) any and all present and future amendments, modifications, supplements, and addenda to any of the items described in clauses (i) through (iii) of this Subsection (l) of Exhibit A; and (v) any and all guarantees, warranties (including building or manufacturer's warranties) and other undertakings (including payment and performance bonds) now existing or hereafter entered into or provided with respect to any of the items described in clauses (i) through (iv) of this Exhibit A (collectively, the **"Contracts"**);

(m)     All of Debtor's right, title, and interest in and to all trade names, trademarks, logos and other materials used to identify or advertise, or otherwise relating to the Premises or Improvements;

(n)     To the fullest extent not prohibited by applicable laws, all of Debtor's rights in all building permits, governmental permits, licenses, variances, applications, conditional or special use permits, and other authorizations now or hereafter issued in connection with the construction, development, ownership, operation, management, leasing or use of the Premises or Improvements (the **"Project Licenses"***);*

(o)     All books, records, and data pertaining to any and all of the property described above, however recorded, stored, or maintained, including digital, electronic, and computer-readable data and any computer hardware or software necessary to access and process such data (**"Books and Records"***); and*

(p)     All products, profits, rents, proceeds of, additions and accretions to, substitutions, and replacements for, and changes in any of the property described above.

118748873.1



1340 Poydras Street, 4th Floor
New Orleans, Louisiana 70112

Land Records Division
Telephone (504) 407-0005

# Chelsey Richard Napoleon
### Clerk of Court and Ex-Officio Recorder
### Parish of Orleans

## DOCUMENT RECORDATION INFORMATION

Instrument Number: 2021-38638

Recording Date: 9/21/2021 08:00:01 AM

Document Type: UCC1 FINANCING STATEMENT EXTRACTED COLLATERAL OR FF
Addtl Titles Doc Types: REAL ESTATE UCC

UCC Number: 36-2021-38638

Filed by: MADISON TITLE AGENCY
1125 OCEAN AVENUE

LAKEWOOD, NJ 08701

## THIS PAGE IS RECORDED AS PART OF YOUR DOCUMENT AND SHOULD BE RETAINED WITH ANY COPIES.

████████████
████████████
████████████

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
JAMES J. SCHWERT, ESQ.  (612) 607-7308

**B. E-MAIL CONTACT AT FILER (optional)**
JSCHWERT@FOXROTHSCHILD.COM

**C. EMAIL ACKNOWLEDGMENT TO:  (Email Address)**

JAMES J. SCHWERT, ESQ.
FOX ROTHSCHILD LLP
222 SOUTH NINTH STREET, SUITE 2000
MINNEAPOLIS, MN 55402-3338

Delaware Department of State
U.C.C. Filing Section
Filed: 07:10 PM 07/30/2021
U.C.C. Initial Filing No: 2021 6014188

Service Request No:  20212854679

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| LAKEWOOD POINTE APTS LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7001 MARTIN ROAD | NEW ORLEANS | LA | 70126 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KEYBANK NATIONAL ASSOCIATION | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 66 S. PEARL STREET, 7TH FLOOR | ALBANY | NY | 12207 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

SEE EXHIBIT A ATTACHED HERETO FOR A DESCRIPTION OF THE REAL ESTATE TO WHICH CERTAIN OF THE COLLATERAL RELATES.

SEE EXHIBIT B ATTACHED HERETO FOR A DESCRIPTION OF THE COLLATERAL.

**5.** Check only if applicable and check only one box: Collateral is  ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:  ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility   **6b.** Check only if applicable and check only one box:  ☐ Agricultural Lien  ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):**  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
Laguna Run Apartments (203807.575) Delaware Secretary of State

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| 9a. ORGANIZATION'S NAME | |
| **LAKEWOOD POINTE APTS LLC** | |

OR

| 9b. INDIVIDUAL'S SURNAME | |
|---|---|
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**10. DEBTOR'S NAME:** Provide (10a or 10b) only **one** additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | | |
|---|---|---|---|---|
| 10a. ORGANIZATION'S NAME | | | | |

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME**  or  ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only **one** name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☑ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**SEE EXHIBIT A ATTACHED HERETO**

**17. MISCELLANEOUS:**

NAME OF FIRST DEBTOR (1A OR 1B) ON RELATED FINANCING STATEMENT

| ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **LAKEWOOD POINTE APTS LLC** | | | |
| INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

NAME OF FIRST SECURED PARTY (3A OR 3B) ON RELATED FINANCING STATEMENT

| ORGANIZATION'S NAME | | |
|---|---|---|
| **KEYBANK NATIONAL ASSOCIATION** | | |
| INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
| | | |

## EXHIBIT A TO UCC FINANCING STATEMENT

### Legal Description

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of New Orleans, Parish of Orleans, State of Louisiana.

That Certain Piece of ground, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the Third Municipal District of the City of New Orleans, Parish of Orleans, State of Louisiana, in Section 20 of the LaKratt Tract (formerly New Orleans Lakeshore Land Co. Subdivision), designated as LOT 2A on a survey by the Office of Gandolfo, Kuhn & Associates, dated December 3, 1971, (H-70-2) and more particularly as follow in accordance with said survey:

Begin at the intersection of the west line of St. Charles Canal and the new south line of Morrison Road; thence along the west line of St. Charles Canal S 21°28'50" E distance of 1381.15 feet to the north line of Interstate Highway I-10; thence along said north line, S 78°01'13" W a distance of 230.57 feet to a point of curvature; thence continuing along said north line in a southwesterly direction along a curve to the right having a radius of 3669.72 feet, a distance of 944.29 feet to the east line of Joffre Road; thence along said east line, N 03°15'48" E a distance of 59.86 feet to a point of curvature; thence along said east line in a northwesterly direction along a curve to the left having radius of 491.27 feet, a distance of 213.42 feet to a point of tangent; thence along said east line, N 21°37'36" W, a distance of 803.66 feet to the new south line of Morrison Road; thence along said south line, which is 20 feet south of and parallel to the former south line of Morrison Road, N 68°15'24" E, a distance of 1060.48 feet to the west line of St. Charles Canal the point of beginning.

Said portion of ground consists of Portions of Groves 1, 3, 5, 7, 9, 11, 13, 15 & 17 of Section 20 of the former New Orleans Lakeshore Land Company Tract.

NOTE FOR INFORMATION: Being Parcel No. 3-9W-0-159-05, of the City of New Orleans, Parish of Orleans

NAME OF FIRST DEBTOR (1A OR 1B) ON RELATED FINANCING STATEMENT

| ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **LAKEWOOD POINTE APTS LLC** | | | |
| INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

NAME OF FIRST SECURED PARTY (3A OR 3B) ON RELATED FINANCING STATEMENT

| ORGANIZATION'S NAME | | |
|---|---|---|
| **KEYBANK NATIONAL ASSOCIATION** | | |
| INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
| | | |

## EXHIBIT B TO UCC FINANCING STATEMENT

All of the following described property and interests in property, whether now owned or existing or hereafter acquired, arising or created:

(a)    All buildings, structures, and improvements now located or later to be constructed (collectively "**Improvements**") on the real property described in Exhibit "A" attached hereto (the "**Premises**"; with the Premises and Improvements collectively referred to herein as "**Project**");

(b)    All existing and future appurtenances, privileges, easements, franchises, and tenements of the Premises, including all minerals, oil, gas, other hydrocarbons and associated substances, sulfur, nitrogen, carbon dioxide, helium, and other commercially valuable substances that may be in, under or produced from any part of the Premises, all development rights and credits, air rights, water, water rights (whether riparian, appropriative or otherwise, and whether or not appurtenant), and water stock, and any portion of the Premises lying in the streets, roads or avenues currently existing or later constructed;

(c)    All existing and future leases, subleases, subtenancies, licenses, rental agreements, occupancy agreements, and concessions relating to the use and enjoyment of or affecting all or any part of the Premises or Improvements, any and all guaranties, extensions, renewals, replacements and modifications thereof, and all other agreements relating to or made in connection therewith, and any agreement (written or oral) between Debtor or its agents, and any tenant, lessee, occupant, licensee, guest or invitee pursuant to which Debtor, or its agent, agrees to permit such tenant, lessee, occupant, licensee, guest or invitee to park in or at the Project (each a "**Lease**", and collectively, the "**Leases**");

(d)    All appurtenances and other property and interests of any kind or character, that may be reasonably necessary or desirable to promote the present and any reasonable future beneficial use and enjoyment of the Premises or Improvements;

(e)    All goods, materials, supplies, chattels, furniture, fixtures, equipment, and machinery now or later to be attached to, placed in or on, or used in connection with the use, enjoyment, occupancy or operation of all or any part of the Premises or Improvements, whether stored on the Premises or elsewhere, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning,

lighting, refrigeration, and plumbing fixtures and equipment, and any manufacturer's warranties with respect thereto;

(f)     All building materials, equipment, work in process and other personal property of any kind, whether stored on the Premises or elsewhere, that have been or later will be acquired for the purpose of being delivered to, incorporated into or installed in or about the Premises or Improvements;

(g)     All of Debtor's interest in and to all operating accounts, all funds to be disbursed by Secured Party to Debtor, whether disbursed or not; all reserve accounts, impound accounts, and any other bank accounts of Debtor relating to the Project or the operation thereof;

(h)     All rights to the payment of money, accounts, accounts receivable, reserves, deferred payments, refunds, cost savings, payments and deposits, whether now or later to be received from third parties (including all earnest money sales deposits) or deposited by Debtor with third parties (including all utility deposits), chattel paper, instruments, documents, notes, drafts and letters of credit (other than letters of credit in favor of Secured Party), that arise from or relate to construction on the Premises or to any business now or later to be conducted on it, or to the Premises and Improvements generally;

(i)     All insurance policies and the proceeds thereof pertaining to the Premises, the Improvements, or any other property described in this Exhibit A, and all proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any property described in this Exhibit A into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding or any settlement in lieu thereof, and all causes of action and their proceeds for any damage or injury to the Premises, Improvements or the other property described in this Exhibit A, or breach of warranty in connection with the construction of the Improvements, including causes of action arising in tort, contract, fraud or concealment of a material fact;

(j)     All of Debtor's right, title, and interest in and to any and all units, common elements, declarant rights, development rights, and any other rights relating to the Premises or the Improvements, whether now existing or subsequently arising, under any and all condominium declarations, covenants, conditions, and restrictions, development agreements, or other agreements or declarations now existing or later executed relating to the Premises or Improvements, and all laws now existing or later enacted relating to the Premises or Improvements, including those relating to condominiums, and all rights of Debtor in connection with any owner's association, condominium association, architectural control committee, or similar association or committee, established in connection with the Project, including Debtor's rights and powers to elect, appoint, and remove officers and directors of any such associations or committees;

(k)     All of Debtor's right, title, and interest in and to any swap transaction or interest rate agreement or interest rate hedging program through the purchase by Debtor of an

interest rate swap, cap, or such other interest rate protection product (an agreement evidencing any such arrangement, an **"Interest Rate Agreement"***)*, all whether now or hereafter entered into by Debtor, including any and all amounts payable to Debtor, any deposit account or accounts with Secured Party in the name of Debtor for deposit of payments to Debtor in connection with any Interest Rate Agreement or swap transaction, and any and all funds now or hereafter on deposit therein;

(l) All of Debtor's right, title, and interest in and to (i) all agreements (except for Leases), commitments, and options now or hereafter existing with respect to the construction, ownership, maintenance, operation, management, or use of the Premises or Improvements, including the Management Agreement between RH East Lake LLC and The Lynd Company dated September 16, 2019 and assigned to Debtor by Assignment and Assumption of Property Management Agreement dated July 28, 2021 executed and delivered by RH East Lake LLC to Debtor; (ii) all plans, specifications, drawings, and reports now existing or hereafter prepared with respect to the Premises or Improvements, including architectural and engineering plans, specifications and drawings, soils reports, environmental reports, and all other property reports; (iii) the Project Licenses (hereinafter defined); (iv) any and all present and future amendments, modifications, supplements, and addenda to any of the items described in clauses (i) through (iii) of this Subsection (l) of Exhibit A; and (v) any and all guarantees, warranties (including building or manufacturer's warranties) and other undertakings (including payment and performance bonds) now existing or hereafter entered into or provided with respect to any of the items described in clauses (i) through (iv) of this Exhibit A (collectively, the **"Contracts"**);

(m) All of Debtor's right, title, and interest in and to all trade names, trademarks, logos and other materials used to identify or advertise, or otherwise relating to the Premises or Improvements;

(n) To the fullest extent not prohibited by applicable laws, all of Debtor's rights in all building permits, governmental permits, licenses, variances, applications, conditional or special use permits, and other authorizations now or hereafter issued in connection with the construction, development, ownership, operation, management, leasing or use of the Premises or Improvements (the **"Project Licenses"***)*;

(o) All books, records, and data pertaining to any and all of the property described above, however recorded, stored, or maintained, including digital, electronic, and computer-readable data and any computer hardware or software necessary to access and process such data (**"Books and Records"***)*; and

(p) All products, profits, rents, proceeds of, additions and accretions to, substitutions, and replacements for, and changes in any of the property described above.